No. 12,664.

### E. K. CLOVER VS. JOE GOTTLIEB.

1. After being put *in mora* by written demand, followed by the filing of a suit to rescind, the offer to execute by the obligor of a contract comes too late.
2. Charges in defendant's answer of violation of the terms of the contract by plaintiff, and basing thereon reconventional demand for rescission and for damages, is inconsistent with offer to perform made previously.
3. One seeking relief through rescission of a contract must first offer to restore his adversary to the situation he was in at the time the contract was entered into.

APPEAL from the Fifteenth Judicial District Court for the Parish of East Baton Rouge. *Brunot, J.*

*J. A. Addison* for Plaintiff, Appellant.

*Thomas J. Kernan* and *Saml. G. Laycock* for Defendant, Appellee.

Argued and submitted December 28, 1897.

Opinion handed down January 24, 1898.
Rehearing refused April 18, 1898.

The opinion of the court was delivered by

BLANCHARD, J. In April, 1896, plaintiff and defendant entered into an agreement, evidenced by an instrument under private signature, by which the latter engaged to sell to the former a tract of land containing two hundred and twenty acres near the city of Baton Rouge, known as the "Howell Place."

The price stipulated was five thousand seven hundred and twenty dollars. Fourteen horses, to be taken at one thousand dollars, were to be delivered to the seller. On March 1, 1897, there was to be a cash payment of seven hundred and fifty dollars, and another of five hundred dollars on January 1, 1898. The remainder of the price was to be paid in one, two, three, four and five years from January 1, 1897.

The buyer agreed to ship the horses (which were in Illinois) to the seller at once, and in the event of his failure to meet the cash payment of seven hundred and fifty dollars on March 1, 1897, they (the horses) were to be forfeited to the seller as liquidated damages for breach of contract.

It was stipulated that the buyer was not to interfere with the tenants on the place during the current year 1896, but that he was to have the use of all other lands and timber not rented for the year 1896, and to have full possession by January 1, 1897.

Another stipulation was "that the rent of the two hundred and twenty acres for the year 1896 shall be paid to the said Gottlieb as part payment on the purchase price."

This agreement to sell was to be effective until March 1, 1897, when a formal act of sale was to be executed, provided the buyer paid the seven hundred and fifty dollars stipulated for on or before that date.

When this contract was made Gottlieb was not the owner of the property he proposed to sell. Whether the buyer was aware of this or not does not appear.

Five days later, on April 20, 1896, Gottlieb secured from the owners, Barrow & Mercier, in writing, an agreement to sell to him,

or to any one he might indicate, the property which had been the object of his previous agreement with plaintiff.

The agreement by Barrow & Mercier stipulated to sell " at any time before March 1, 1897, for the sum of three thousand three hundred dollars," of which seven hundred and fifty dollars should be paid in cash when the sale was formally consummated; the balance in one and two years. Should Gottlieb pay the seven hundred and fifty dollars by March 1, 1897, he was to have the rents of the place for 1896. He stipulated for the right of using the lands not rented for 1896 and the timber thereon, and also that he was to have a commission of five per cent. on the agreed price, whether buying for himself or for another.

Neither of these agreements to sell and buy were registered in the conveyance records. It does not appear that plaintiff was ever informed of the existence of the one executed by Barrow & Mercier to the defendant, and up to the time this litigation began there had been no formal transfer of the title to the latter. It still stood in the name of Barrow & Mercier.

Pursuant to the agreement between plaintiff and defendant a lot of horses were shipped to the latter, who received them in May, 1896, took possession and sold them.

On the 1st of January following, the time when full possession of the Howell place was to be given to plaintiff, he was not put in possession, and, so far as the public records showed, defendant himself had at the time neither possession nor title.

Several times prior to the institution of this suit verbal demand for possession was made by the plaintiff and his attorney upon defendant without avail, and then, on the 16th of January, 1897, a formal demand in writing for possession was made.

This was followed two days later by the present suit filed January 18, 1897. The next day defendant called with witnesses on plaintiff and formally tendered possession and full compliance with the terms of the agreement.

Plaintiff replied that it was too late; that the matter would have to take its course in the courts.

While the suit had been filed the day before, it seems that service of citation had not actually been made upon defendant at the time. It was made later the same day.

When defendant tendered possession to plaintiff on January 19,

1897, he said nothing whatever to him in regard to the horses which had been delivered by plaintiff; no claim was made at that time by defendant that the delivery of horses was short or insufficient, and no demand then or prior thereto was asserted to make good this shortage.

Not until developed in the defence of this action was it insisted that plaintiff's delivery of horses was not up to contract requirement, and, therefore, was cause for non-compliance by defendant with his obligati on to deliver possession of the place on January 1, 1897,

If plaintiff was deficient in his delivery of horses, he was not put in default by defendant in reference thereto as a condition precedent to the claiming of damages or rescission of the contract.

The shortage of one horse was accounted for by the fact that one Humphreys, claiming to act for defendant, traded in Illinois, before the horses started southward, three of the Clover horses for two of another lot. Defendant admits that he raised no objection to this act of Humphreys when informed of it.

Another horse died in transit. Plaintiff claims to have accounted for its value to defendant in paying the freight on the shipment of horses; that the freight bill was a charge against defendant, but that he only called upon defendant for its amount less the estimated value of the dead horse—he (plaintiff) paying that much of the freight bill himself.

Defendant, on the other hand, insists that under the contract the freight on the horses was to be paid by plaintiff, and we are inclined to construe the agreement that way.

When the horses reached Baton Rouge there was a contention to the effect that one horse was short still, and it was searched for, but this appears to have been abandoned by defendant, who took possession of the horses (thirteen head in all, counting two colts), used them and sold them, and never thereafter applied to plaintiff to make good any supposed shortage as to number and quality of animals delivered under the contract.

This being so, it does not lie in the mouth of defendant to assert, as he did in his testimony, that he did not receive this delivery of horses as a discharge of plaintiff's contract obligation in regard thereto.

Having delivered the horses, and the same having been accepted

by defendant, plaintiff was not to be considered in default unless he failed to meet the payment of seven hundred and fifty dollars, due March 1, 1897. Should he fail to meet that payment, then, under the terms of the agreement, defendant was to retain the horses as liquidated damages.

The next step under the contract, after delivery of the horses by plaintiff, was to be performed by defendant. He was to deliver plaintiff full possession of the tract of land on January 1, 1897. He failed to do this and was put in default therefor, both by written demand and by the institution of this suit, seeking rescission of the contract because of non-execution of its stipulations by defendant.

After this demand and after the filing of the suit, the offer to execute by defendant came too late. 24 An. 236; 8 R. 161; 20 An. 292; 38 An. 773; Toullier, Vol. 6, p. 253, No. 246; Ib., No. 255.

Defendant meets the suit with charges of violation of the terms of the contract by plaintiff, asks its rescission because thereof, and for damages.

This is, in effect, a reconventional demand.

The inconsistency of this pleading with the offer to perform made just after the suit was filed is apparent.

Besides, a party seeking relief through rescission of a contract must first offer to restore his adversary to the situation he was in before the contract. 1 Hen. Dig., p. 1020, No. 19.

Defendant could not keep the property and the horses also. The latter were to be forfeited to him only in the event plaintiff failed to meet the payment due March 1, 1897, which time had not then come around.

Before it did, defendant, by failure to keep the engagement as to possession of the land, produced a condition justifying this suit for rescission.

We hold that plaintiff's right to sue for rescission legally existed at the time the suit was filed, and that he, not defendant, is entitled to the judgment of rescission.

This carries with it the right to have an accounting with defendant for the horses delivered to him.

The question arises, does defendant owe plaintiff the price at which he agreed in the contract to take the horses (one thousand dollars), or does he owe him merely the horses themselves, or their

value as ascertained by what they were worth on the Baton Rouge market?

We think the ends of justice best subserved by holding the latter.

Both parties ask abrogation of the contract *in toto.* We will grant it, both as to the tract of land and as to the stipulated price of the horses.

This will leave defendant holding possession of eleven horses and two colts belonging to plaintiff.

But the horses having been disposed of, defendant must account for their value.

We find from the evidence that nine horses and two colts sold for five hundred and sixty-five dollars. Two horses appeared to be still on hand when this suit was tried below. They may not be on hand now, so we will estimate them at fifty dollars each, the least price for which any of the horses sold.

We thus find six hundred and sixty-five dollars as the value of the horses, from which must be deducted ninety-six dollars paid as freight by defendant on the shipment of horses, held to be a charge against plaintiff and not against defendant.

This will leave a balance of five hundred and sixty-nine dollars due plaintiff. We do not think defendant entitled to credit for expenses claimed on account of the keep of the horses, etc. The use of the horses and interest on the money for which they were sold would set off such claim, even were it a just one.

It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and it is now ordered and decreed that there be judgment in favor of plaintiff against defendant, canceling and rescinding the agreement to sell certain lands situated in the parish of East Baton Rouge, entered into by the parties hereto on April 15, 1896.

It is further ordered and decreed that the plaintiff, E. K. Clover, do have and recover from defendant, Joseph Gottlieb, the sum of five hundred and sixty-nine dollars, with five per cent. interest per annum thereon from the date of the filing of this suit in the lower court, together with costs of both courts.