PROVOSTY, J.
This is a suit to rescind a sale of real estate for nonpayment of the purchase price. Plaintiff put defendant in default by making upon him in the manner prescribed by law a demand to pay, and then the next day brought this suit. Defendant failing to answer, plaintiff caused a default to be entered; and then the defendant made to plaintiff a tender of payment in full, including costs of court. Plaintiff refused to accept, assigning as his reason that an offer of performance comes too late after a putting in default. Defendant then answered, renewing the tender, and pleading in the alternative, that the suit should have been accompanied by a tender of some notes held by a third person, which defendant had assumed to pay as part of the purchase price.
[1, 2] This third person has never accepted this promise to pay his debt, and therefore has never become a party to the contract. Such being the case, this third person was not a necessary party to the suit, and there was no necessity of tendering his notes. C. C. arts. 1902; 1890; Marcadé, vol. 5, p. 284. In the case of Bryant v. Stothart, 46 La. Ann. 489, 15 South. 76, cited by defendant, the court found, as a fact in the case, that the third person had accepted the promise made in his favor.
[3] But we think plaintiff should have accepted the tender. The said proposition, that offer of performance comes ioo late after putting in default, upon which the refusal to accept the tender was based, is not good law, and cannot possibly be. To demand of the debtor that he carry out the contract cannot possibly, in reason, be held to have the effect of ipso facto cutting off his right to carry it out; and to put in default is nothing else than to demand of the debtor that he carry out the contract. The Code expressly says so. The debtor is put in default by the act of the party, says article 1911, “when at or after the time stipulated for the performance, he demands that the contract shall be carried into effect.” We can understand that such, a thing might be as that after the time stipulated for performance has passed the *382 debtor should no longer be In time to perform; or, in other words, should no longer have the right to perform; but certainly such a thing cannot be as that the demand of him that, he do perform, or, according to the technical expression, the putting him in default, can have the legal effect of destroying his right to perform. It would be making the creditor address the debtor in effect after this fashion: I demand of you that you perform; but, mind you, my object in doing so is not to require that you perform, but to cut you off from the right to perform. To put upon the articles of the Code a construction of that kind would be making them speak in a Pickwickian sense. Such a thing, we say, is not possible, as for instance, that a man under obligation to deliver should be cut off from the right to deliver by demand to deliver being made upon him.
[4] In further proof of what we have here said, let us see what putting in default is — what is meant by it? The Code does not define it, but prescribes in article 1911, just quoted, the manner of it, which is in effect a definition. It is, says that article, to demand of the debtor that he carry out the contract. And the Code also informs us what its effects are. It declares that they are, namely, that the debtor owes damages from that moment, and that the thing to be delivered is at his risk. Articles 1910,1932, and 1933. But it nowhere says that it shall have the effect of cutting off the debtor’s right to perform. Toullier, vol. 6, No. 240, says:
“If the obligation is pure and simple, if the term has expired, or the condition been accomplished, the contract must be executed at once and without delay, failing which the debtor is tardy, and is in default in the ordinary sense of that word; but is he liable to damages by reason solely of this delay? Is he in default in the judicial sense of that word in which it is a technical term expressing that kind of tardiness which subjects the debtor to damages?”
The learned author here says that putting in default is a technical term expressing that kind of tardiness which subjects the debtor to damages. He does not say it is an instrument with which the law has armed the creditor for cutting off his debtor’s right to perform.
Laurent, vol. 16, p. 234, says:
“To put in default is a purely technical expression, meaning that the debtor is tardy in the fulfillment of his obligation, and that he is liable for the damages which the delay may occasion to the creditor.”
This definition of putting in default is quoted approvingly by this court in Murray v. Barnhart, 117 La. 1024, 42 South. 489.
In Taylor v. Chase, 18 La. 91, this court said:
“A putting in default * * * is when the party claiming the performance of the contract demands of the other party to carry it into effect.”
The Code mentions putting in default in no. other connection than this. It nowhere refers to it as a means of cutting the debtor off from the right to perform.
Dalloz Kepertoire de Legislation, vo. Mise en Demeure, says:
“G’est le fait de demander a un individu de remplir un engagment.” Angliee: “It is the act of demanding of a person that he fulfill his engagement.” ■
Carpentier and du Saint, Kep. du Droit Franeais, vo. Condition, No. 771, says:
“Inasmuch as putting in default presupposes the desire on the part of one of the parties that the contract should be carried out, this formality becomes objectless when the dissolution of the contract is being demanded by both sides.”
Citing decisions and text-writers.
And again, the same work, vo. Dommages — Interests, No. 143:
“Putting in default presupposes on the part of one of the contractors the desire that the contract should be carried out. Were the setting aside of the contract mutually demanded, the putting in default would cease to have any object.”
In line with this are our own decisions, to the effect that putting in default becomes a vain ceremony to which the law will compel no one whenever there is a refusal, or an *384 acknowledged inability, to perform. Allen, West & Bush v. Steers, 39 La. Ann. 586, 2 South. 199; Southern Sawmill v. Ducote, 120 La. 1052, 46 South. 20, and the cases cited in these two decisions.
[5, 6] Putting in default is not a thing invented by the framers of our Code. It was taken by them from the civil law. And it was thus taken in the same condition in which it was there found. Hence, in determining what is its nature and proper function we may in all safety go to that system as expounded by its courts and law-writers. And we there find that putting in default means nothing more, and has no other function than as has been just stated; that it does not destroy the contract or the right of the debtor to perform, but that, except in cases where the contract otherwise stipulates, or where from the nature of it time is of the essence (by which we mean is of such importance that the parties would not have contracted without it), the debtor is in time to perform until final judgment pronouncing the dissolution. Thus, Hue, on article 1184, C. N., Obligations, No. 271, says:
“What, then, is going to be the effect of the nonfulfillment of the contract when that non-fulfillment has been established by a putting in default?
“Article 1184 answers that the contract is not resolved of right: the resolution must be demanded judicially, and a delay may be accorded the defendant according to circumstances.
“Hence the debtor may yet execute the contract after having been put in default; he may still execute it after suit has been filed and up to judgment; and if the judgment has granted him a delay, he may execute it up to the last day of the delay.”
To the same effect, Aubry & Rau, vol. 4, sec. 302; Mourlon on article 1184, C. N., which is our article 2046, and other commentators on same article; and for decisions of French courts, see Dalloz, Code Civil, art. 11S4, Nos. 83 and 91.
Thus, Demolombe, des Contrats, liv. Ill, tit. Ill, chap. Ill, Nos. 532 and 544:
“The rule, we say, is that the putting in default, once it has been incurred by the debtor, accrues to the creditor. But from this we must not conclude that this default is irreparable, that the debtor cannot relieve himself from it. There would be for this no reason. Hence, on the contrary, the default may cease, either from the act of the debtor, or from that of the creditor. The default is done away with by the act of the debtor when he makes to the creditor an offer of performance followed by a regular deposit. It must be well understood, however, that this tender puts an end to the effects of the default only in so far as the future is concerned, and that it could not deprive the creditor of the results which the putting in default has theretofore produced in his favor, dating from the day on which it was incurred. Toullier, vol. 3, Nos. 256 et seq., Duranton, vol. 10, No. 488; Zaeharias, Aubry et Rau, vol. e, p. 66.”
Thus, Oarpentier et du Saint, Rep. Droit Franc., vo. Mise en Demeure, No. 3.
“As a general rule, default once incurred by the debtor accrues immediately to the creditor. But the debtor may be relieved from it either by his own act or by that of the creditor.”
The reasons why the vendee may pay after suit brought are given by Demolombe on Contracts, p. 490, Nos. 514 and 505, as follows:
“The judgment of the court does not confine itself to recognizing and declaring the resolution of the sale. It goes further. It, itself, creates, and then applies, it. So that, very justly it is said that in such a case the resolution is judicial.
“515. This rule is important. It results from it that so long as the judgment which pronounces the resolution has not been rendered, the contract continues to exist; and if it continues to exist, it continues to have its effect; and, in consequence, the defendant can, so long as the suit is pending, escape from the resolution by carrying out his contract. For, in last analysis, this performance of the contract is what always the plaintiff is seeking, although his prayer is for the resolution of the contract. The suit in resolution is an extreme measure to which he has recourse only because he has not obtained performance and has despaired of obtaining it. Hence, it is not going against his demand in resolution, for cause of nonperformance, to answer it by performance. Then, again, the cause of the resolution must exist at the moment of the judge’s decree; and’this cause has ceased to exist in the ease where performance has taken place.”
“517. Nay, more. It is not only before judgment that the demand in resolution may be thus stopped and the resolution no longer be allowed, but it is even after judgment. It is *386 clear that if there is an appeal, which reopens the question passed on by the judgment, the parties will in the appellate court find themselves in the same situation in which they were in the trial court. See Pothier, du Contrat de Vente, JSTo. 476; Duranton, Troplong des Contrats Aléatoires, Nos. 297 et seq.; Larombriere, T. 2, art. 1184, Nos. 21 and 46.”
“530. The seller has two’ actions: One principal, and the other subsidiary. The logical order of the most elementary ideas requires that he begin by his principal action before having recourse to the subsidiary. For, what is the right which the contract has engendered in his behalf? It is the right to demand payment. Hence, his principal action, the one which springs from the contract itself, has for its object the obtaining of payment. The action in resolution is but subsidiary, supplementary; it is but an extreme measure which, for want of something better, the law offers to the litigant, as a last refeort, and despairing of the situation.”
To the same effect, Baudry-Lacantinerie, Obligations, sec. 927, thus:
“The resolution being brought about only as an effect of the judgment, the contract continues to exist so long as the judgment has not been rendered. So that,_ as long as the case is pending the defendant is in time to avoid the resolution by executing the obligation.”
Carpentier and du Saint, Rep. Juris, vo. Vente, No. 2095:
“Since the resolution of the sale does not take place of right, the purchaser can avoid it by paying the price, after the institution of suit, subject to liability for costs.”
Laurent, vol. 17, sec. 135, says:
“Can the debtor prevent the resolution by executing his engagements; and,, if so, up t.o what moment? One answers, and with reason, that the debtor may pay up to the time that the judge pronounces the resolution. In effect the creditor never has an absolute right to resolve the sale, for it does not exist by virtue of the contract, but it is the court that pronounces it from motives of equity. * * * The resolution does not become definitive until the judgment has acquired the authority of the thing adjudged. The defendant may appeal; the appeal destroys the judgment of the trial court; the contract preserves its force, and, as a consequence, the debtor has the right to pay pending the appeal.”
Larombiere, yol. 2, p. 353, § 46:
“The action is brought before the court and issue is joined. The defendant then admits that he has not executed his obligation. Is he simply in default of his obligation in such manner that he can still execute it? This he may as long as the case is before the court. * * * Even after judgment of the trial court which has decreed the resolution, the defendant has only to appeal in order to place himself in the position to execute his obligation. In a word, the defendant is not barred from the right of paying until the resolution is definitively adjudicated in favor of the plaintiff; that is to say, when the judgment which has been rendered has become definitive and final.”
Aubry & Rau (5th Ed.) yol. 4, § 302, p. 130:
“The defendant may execute his obligation up to the time that the judgment pronouncing the resolution becomes final and definitive.”
See note 83 to text above cited as follows:
“In a case in which the judge fixes the delay, if after the expiration of the delay a second action is necessary to bring about the resolution, the defendant may even pay pending the second suit. Indeed, he may pay during the pendency of the appeal.”
Baudry-Lacantinerie on Obligations, § 927:
“Section 914: The tacit resolutory clause has been designed by the legislation as a guarantee to the creditor against the ill will of the debtor. From this point of view, it resembles the penal clause, that only applies when inexeeution is brought about by default of the debtor. This is settled. It is the same with the tacit resolutory clause. Having the same object as the penal clause, it ceases, as the other, to have any application when its enforcement would not tend to accomplish its object. The provision of article 1184 of the Code of Napoleon being of an exceptional nature must be strictly construed.”
“Section 917: The fact of demanding execution of an obligation does not imply renunciation of the tacit resolutory condition; that, as w'e have seen, is of a merely subsidiary character. Its utility appears only when the party invoking it cannot obtain execution of the contract.”
The same author in his treatise on “Sales” says:
“Section 550: The resolution of the sale, not taking place of itself, the purchaser can pay the price until the resolution has been judicially decreed, even pending the suit brought by the vendor to enforce it; but he must pay the cost of the court due to the suit. Can he pay even after the judgment which has pronounced the resolution? Certainly not, if the judgment is a final one. If the judgment is susceptible of appeal, the purchaser can, on taking appeal, set aside the resolution of the sale, by payment at any time until it has been definitely decreed.”
From Fuzier-Herman, Code Civil, art. 1184, No. 68, we take the following:
“Inasmuch as the resolution does not take place of right, the debtor escapes from it by the *388 fact itself that he executes the obligation before the resolution is pronounced, and notwithstanding the fact that the suit for resolution is pending.”
See to same effect Aubry & Rau, vol. 4, No. 388, p. 96, Laurent, vol. 16, No. 236. The latter, at No. 244 of same volume, says:
“Default is legal tardiness. It gives certain rights to the creditor as long as it continues. But nothing prevents the debtor from fulfilling his obligation by tendering or delivering the thing. Por in that moment he ceases to be in default, and as a consequence damages cease to accrue against him, and the thing to be delivered ceases to be at his risk. It goes without saying that the effects already produced by the default do not cease. The creditor is entitled to damages so long as the default lasts; if the debtor executes the obligation the damages already incurred continue to be due.”
See to the same effect Phzier-Herman, Code Civ. AnnotS, art. 1139, Nos. 33, 34, citing a number of text-writers.
In fact, multiplication of citations is needless, since there is no difference of opinion on this point in Prance.
The only difference of opinion in this matter in Prance would seem to be on the points whether the damages to which the debtor is made liable by the putting in default include or do not include those already suffered by the creditor at the date of the putting in default; and whether the debtor has not yet a “moral delay,” within which to perform, after the service of citation in the case provided for by article 1656, O. N., our article 2563, which reads:
“If, at the time of the sale of immovables, it has been stipulated that, for want of payment of the price within the term agreed on, the sale should be of right dissolved, the buyer may nevertheless make payment after the expiration of the term, as long as he has not been placed in a state of default, by a judicial demand, but after that demand, the judge can grant him no delay.”
It may be interesting to note that putting in default, as found in our law, is not known at common law;' and that this court has had occasion more than once to animadvert upon its adoption into our law, as will appear from the following:
The first case in which this requirement of putting in default was invoked in our jurisprudence was Erwin v. Fenwick, 6 Mart. (N. S.) 231, where the court, through Porter, J., said of it:
“With the exception of the case of Bryan v. Cox, 3 Mart. (N. S.) 574, which went off on another ground, this is the first time in our experience that such a defense has been offered, though the cases in which it might have been made have frequently presented themselves. It is one which cannot but be felt to have but little relation to the merits of the case, and not likely to promote its equity. Yet so clear and positive is our legislation on this subject that we have been compelled, though slowly and reluctantly, to come to the conclusion that it must prevail.
“The doctrine on which it rests, like most of the others in our jurisprudence, had its origin in the Roman law. In that system, however, it was limited in such a manner as to meet, in general, the intentions of the parties, and was entirely conformable to reason and common sense. It was confined to those cases, where, by the terms of the contract, no particular time was fixed for the performance, and the necessity of calling on the obligor before there was, in the eye of the law, a breach of his agreement, arose from the consideration that it was presumable it was to be discharged at the demand of the obligee, and not before. Prom Rome, this principle was carried into Prance, where it was extended to all agreements, whether a certain period was fixed for discharging them or not. The utility and wisdom of such regulations are certainly not obvious to this court. But, considerations of this kind belong to that branch of the government which makes laws; not that which expounds them. Our Legislature have adopted, in its entire extent, the rules which are established in Prance, and we have no alternative but to enforce them. Toullier, vol. 6, Ub. 3, cap. 3, Ño. 241.”
In Sewell v. Hennen, 8 Rob. 216, this court, speaking of a defense of not putting in default which on a previous occasion it had sustained, said that it was “so technical, that it is not easy to give a common-sense reason for the conclusion to which we came; and we could only say, and say it with an expression of regret, sed ita lex scripta est.”
In Sewell v. Willcox, 5 Rob. 87, this court, Bullard, J., said:
“We have, on more than one occasion, expressed our regret that such subtleties should have found their way into the Code.”
*390 In Stewart v. Paulding, 6 La. 154, this court, Matthews, J., said that this rule as to putting in default was “purely arbitrary.”
In Berje v. T. & P. R. R. Co., 37 La. Ann. 470, the court said:
“This court very early remarked the inutility and unwisdom of the requirement even in cases of passive breaches of contracts.”
[7] We do not think that this requirement of putting in default is fairly open to these reproaches, since it is dictated, by the same spirit of justice which leads the courts of equity at common law to grant further time to perform, and simply 'establishes into a rule the principle which thus actuates these courts; the same which deprecates the taking of snap judgment, and hence compels the creditor to give fair warning to the debtor if he desires the contract to be performed strictly on time, in all those cases where time is not material. But if putting in default were to be wrenched from this its proper function of giving warning in order that the debtor may perform, and converted into an instrument for destroying the right to perform, it would deserve, and richly so, this severe arraignment of it.
[8] Another point upon which the French courts and test-writers are agreed is that this remedy of enforcing the resolutory condition is not a primary remedy, but only a secondary one, to be exercised only in case the primary cannot be made available. This has already appeared from the extracts herein-above transcribed. We will give some further extracts, as the point is important.
Pothier, Vente, No. 476, after calling attention to the fact that the Boman law did not allow a credit sale to be resolved for nonpayment of the purchase price, proceeds as follows:
“But as it often happens that one cannot compel payment without considerable trouble and expense this principle has had to be departed from, and the vendor is now allowed to demand the resolution of the contract of sale for nonpayment of the purchase price, even in the absence of a clause that for want of payment of the price the sale shall be of right dissolved.”
It is thus seen that this right to demand the resolution of the sale has been allowed only as a means of obtaining payment.
Toullier, in his work on Contracts, expressed the view that by bringing suit to enforce the contract, the creditor debarred himself from suing in rescission; but in his later work on Presumptions, vol. 10, 191, he frankly acknowledges that this was an error on his part, and he quotes Merlin approvingly, as follows:
“This results from what I have said in commenting on the provisions of art. 1184, which are applicable to all synallagmatic contracts, and results more specially still from article 1655 (La. Code, art. 2562), which, when the resolution of the sale has not been expressly stipulated, in the contract, authorizes the judge to decree it only after the vendor has exhausted every remedy for obtaining payment.”
Note what is here said: The resolution of the sale is allowed “only after the vendor has exhausted every remedy for obtaining payment.” Can a vendor to whom payment in principal, interest, and costs is tendered and who refuses to accept be said to have exhausted every remedy for obtaining payment?
In Canal Bank v. Copeland, 15 La. 79, this court, in discussing the point whether by first bringing suit against the purchaser for the purchase price the vendor did not debar himself from thereafter bringing suit for the resolution of the sale, said:
“From the above articles, it should seem that a previous suit for a specific performance of a contract, far from being a bar to a subsequent action for its rescission, is by our law considered as one of the preliminary steps to be resorted to.”
in Perkins v. Frazer, 107 La. 393, 31 South. 773, this court said:
“The spirit of the law is against the enforcement of the resolutory condition, and in favor of the contract being carried out if possible.”
[9]Not only does our law in cases where immediate performance is possible and is *392 tendered pending suit require the creditor to accept it, brat in the ease of contracts not thus susceptible of immediate performance, it authorizes the judge in his discretion to grant time in which to perform. C. O. art. 2047.
[10] “By the law Of England,” says Benjamin on Sales', book V, part 1, p. 622, of 2d London Ed., “differing in this respect from the civil law, the buyer’s default in paying the price will not justify an action for the rescission of the contract, unless that right be expressly reserved.”1
In other words, the resolutory condition is not implied. Benjamin is dealing with sales of personal property; but the same is, •doubtless, true in the case of sales of real •estate in the sense in which the resolutory condition is understood and operates in our law.
The wisdom of its adoption into our law may well be doubted. Troplong, in his commentary on article 1654 of the O. N., our article 2561, says:
“Art. 1654, which we are now going to analyze, is exceedingly grave. To the securities accorded to the vendor by the chapter on privileges, it adds the faculty of having the contract resolved, notwithstanding the changes to which real estate sold may have been subjected, notwithstanding the mortgages that may have been placed upon it, notwithstanding any judicial sale that may have been made of it, notwithstanding even any distribution that may have taken place of the price of any such sale among the creditors of the vendee who, confident in the common pledge of this property have distributed its value among themselves. I have shown in my commentary on privileges and mortgages and in the preface to the first volume of that work, in what respect this right to resolve the contract infringes upon the rights of creditors and purchasers, and how it constitutes a cog which the legislator has not succeeded in fitting into the hypothecary machine.
“The jurisconsults of Rome had conceived on the subject of sales ideas less favorable to the rights of the vendor than we have, but better adapted in their results to come in aid of, and foster, individual credit. It is not that I think that the jurisconsults of Rome had the least idea in the world of developing a priori by combinations of jurisprudence individual credit. This element of public prosperity is as yet quite new in law, and has hardly as yet claimed recognition in it. But in reality the Roman jurisconsults had, without premeditation or scheming, lighted upon a theory which may one day arise out of the neglect in which our modern ways have left it, to take a place among the plans of reform inspired by the' desire to procure for individual credit more stability and -se.curity.”
How well grounded these remarks are is illustrated every day by those cases wherein by the enforcement of the resolutory condition the property sold is made to return to the vendor free of the incumbrances to which it may have become subject while in the hands of the vendee.
[11] Nothing can bring into a stronger light the true spirit and intent of our law in allowing at all the dissolution of sales in this manner than that provision of article 2047 by which the whole matter of allowing the dissolution or not, or of granting further time or not, is left to the judge, so that the dissolution of the contract never does become a matter of absolute right on the part of the creditor.
[12,13] The ground upon which the French commentators base themselves for holding that the debtor is in time to perform, so long as the resolutory condition has not been judicially declared, is that until then the contract has not been dissolved or put an end to, but continues to be in full force and vigor, and therefore is not only susceptible of performance, but calls for it. This ground appears to be very solid. But whatever may be thought of it, and whether these jurists are correct or not in their view that the contract remains open to performance until then, we do not think there can be in reason any ground for not holding that the debtor is not cut off from performance by the formal demand made upon him to perform, but that a reasonable time should be allowed him to comply with this demand. If the Code had intended that putting in default should have the effect of cutting off the right to perform it would have prescribed a different mode *394 of putting in default than that of demanding of the debtor that he perform. What this reasonable delay should be, would depend naturally, upon circumstances; and we do not believe it could be unseasonably cut short by the bringing of suit. The bringing of suit does not confer new rights, or take away any, but merely enforces those already existing.
[14] Especially in sales of immovables should the delay for performance not be allowed to be cut off by a putting in default.
Says Troplong, Vente, No. 667:
“This exception of article 1183 [our article 2563] must not be extended to sales of movables accompanied by an express resolutory condition. In such sales the resolutory condition is accomplished by the mere expiration of the delay fixed in the contract. The vendor has no need of causing an official notice to be served upon the vendee to put him in default, and the latter is not allowed to pay after the time stipulated. But in sales of immovables, the lawmaker has thought it well to be less rigorous, and here is the reason why. The resolution in such a case entails very grave consequences, it necessitates the payment of stamp dues, it disturbs possessions of long standing, it affects the rights of third persons. Hence, he has had to adopt the ideas of prudent legislation, and be willing to accept all that may save the purchaser and his assigns from such disturbance, without injuring the interests of the vendor.”
[15,16] Article 1912 of our Code contains a provision not found in the Gode Napoleon, namely, that putting in default “is a prerequisite to the rescission of the contract.” •The article in full reads as follows:
“The effects of being put in default are not only that, in contracts to give, the thing, which is the object of the stipulation, is at the risk of the person in default, but in the cases hereinafter provided for it is a prerequisite to the recovery of damages and of profits and fruits, or to the rescission of the contract.”
The said provision not contained in the Code Napoleon was designed simply to settle a point controverted under the Gode Napoleon —whether putting in default i.s a prerequisite to an action in rescission. Laurent, vol. 24, par. 379; Dalloz, Codes Annotés, art. 1184, No. 65. It brought no change in our law from the French law. The thought that dictated it was the same precisely which requires that the debtor shall be put in default; i. e., shall be fully warned, before damages can be required of him. Our law provides that he shall be put in default; i. e., fully warned, before either damages shall be demanded of him, or the rescission of the contract shall be demanded. This merely in a spirit of equity. This putting in default, it will be observed, is. necessary only in those contracts which can be performed as well at one time as at another, or, to use the common-law expression, where time is not of the essence. It is not necessary in suits in rescission for fraud or error or' for lesion beyond moiety, or for any other cause of nullity. Copley v. Flint, 16 La. 386.
Having thus arrived at clear ideas on these subjects of putting in default and of the enforcement of the implied resolutory condition, we are in a better position to review intelligently the decisions in which the said proposition of offer of performance coming too late after putting in default has been announced as being good law. .
The first of these cases in time, and the' one which has been accepted by all the others as authority for that proposition, is Moreau v. Chauvin, 8 Rob. 161. The facts in it were, as follows: Plaintiff had bought from defendant a slave upon which rested a minor’s mortgage, the defendant engaging to have this mortgage released within 40 days. Defendant failed to cause the mortgage to be released, and plaintiff, long after the expiration of the 40 days, and after repeated demands, but without observance of the formalities prescribed by the Code for putting in default, brought suit to rescind the sale. The court recognized that defendant had not been put in default in the manner prescribed by the Code, or, in other words, had not, legally speaking, been put in default at all. In deciding the case it said:
*396 “But the counsel for the appellants urges that the plaintiff cannot maintain this action, because he has not put the defendants in mora, pursuant to the several provisions of the Civil Code, which require this formality as a prerequisite to the recovery of damages, or the rescission of a contract. Articles Í905, 1906, 1907. There has not been, on the part of plaintiff, a strict compliance with these articles, in the manner in which the defendants have been called upon to execute their contract; but the evidence shows that they were several times requested to have the mortgage erased; that the plaintiff was prevented from selling the slave, by reason of this incumbrance. * * * It appears to us that, in a case like the present, it was not necessary to put the defendants in default in the manner pointed out by the articles of the Code relied on by the counsel. The object of putting in default is to secure to the creditor his right to demand damages, or a dissolution of the contract, so that the debtor can no longer defeat this right, by executing or offering to execute the agreement. After the debt- or has been put in mora, his offer to execute his engagement comes too late, and cannot be listened to. 6 Toullier, No. 255.”
[17] It will be observed that defendant had not been put in default; that he had not offered to perform; nay, that it had not been in his power to perform; so that the proposition of an offer to perform coming too late after putting in default had absolutely nothing to do with the case, and was the purest obiter. And it will be observed further that this proposition was thus quoted without any appositeness whatever and without any inquiry into its soundness.
In the next case in time (Morrison v. Wimberly, 14 La. Ann. 713) the facts were as follows: Plaintiff had sold a tract of land to defendant on a credit, and, defendant failing to pay, plaintiff brought suit to set aside the sale for nonpayment of the purchase price. Defendant pleaded that he had not been put in default, and the court sustainéd that defense and dismissed the suit. Plaintiff then made a formal demand of payment for putting the defendant in default, and then, at once, as we understand, renewed the suit. Defendant then tendered payment, and the plaintiff refused the offer, as coming too late after default, and the court, on the authority of the Chauvin Case and of a passage from Toullier, which we shall show was quoted in error, held that an offer of performance comes too late after a putting in default, and sustained plaintiff to the extent of throwing the costs on defendant; but, by an exercise of its discretion under article 2047 of the Code, compelled plaintiff to accept the offer.
This proposition of an offer of performance coming too late after default, was thus adopted in these two cases without any discussion of its merits, and, apparently, without any inquiry into its soundness, simply and purely upon the authority of two passages from Toullier. One of these passages we shall show relates to a different subject-matter, and was quoted in error; and the other was, as we shall endeavor to show and we believe • shall succeed in showing, was misunderstood. And upon no better foundation than this, and with no more examination or discussion than this, was this same proposition repeated in the several other cases cited by plaintiff’s learned counsel, which we now proceed to review.
In Pratt v. Craft, 19 La. Ann. 130 and Id., 20 La. Ann. 291, the facts were, that in December, 1865, the defendant had received $1,000 from the plaintiff in part payment of 13 bales of cotton at 47 cents per pound to be delivered on plaintiff’s plantation, the remainder of the price to be paid on delivery of the cotton. No mention was made of any date for the delivery. More than a year later, the plaintiff sued for $4,000 damages because of the nondelivery of the cotton, and the defendant pleaded that plaintiff had never paid the remainder of the purchase price, and, besides, had never put him in default. The plaintiff had made repeated demands for delivery, but had not observed the legal forms for putting in default. The defense of failure to put in default was sustained, and the suit dismissed. Plaintiff then made *398 formal demand for tlie purpose of putting in default, and the defendant tendered the •cotton in compliance with the demand. This was 2 years after the date of the contract. The court held that the contract called for the delivery of the cotton at once, and added:
“Had the defendant delivered the cotton immediately after the War, the plaintiff would have received it then, but when the offer or tender was made it was too late.”
The court then quoted from Moreau v. Chauvin, 8 Bob. 161, to the effect that:
“After the debtor has been put in mora, his offer to execute his engagement comes too late, and cannot be listened to.”
[18] On its facts the decision is, of course, perfectly correct. A party under obligation to deliver goods at once cannot wait for 2 years notwithstanding repeated demands, and then seek to compel the other party to receive them — especially after the market price of the goods has fallen as rapidly as the price of cotton did from the high level it attained immediately after the War. But the doctrine of the case, namely, that a party under obligation to deliver forfeits his right to deliver, if he waits until a formal demand has been made upon him to deliver, •cannot possibly be correct.
In City v. Rigney, 24 La. Ann. 235, notes had been given for the rent of a public market, in pursuance of a lease stipulating that any failure to pay the notes at maturity “shall •operate to annul and cancel this contract.” At the maturity of the notes they were formally presented for payment, and were protested for nonpayment, and suit was brought under said clause to cancel the lease. The defendant contended that he had the right to make payment at any time before judicial demand, basing himself upon article 2563 of the Code. The court held that this article had reference only to the sale of immovables, .and that the said clause in the contract was ■the law of the case. The court then added, as an additional ground of decision, that an offer to perform comes too late after putting in default, and cited the Chauvin and Pratt Cases, and Toullier. The suit was distinctly founded upon the said clause of the lease, and hence this additional reason given by the court was entirely unnecessary for the decision of the case. If the case were founded ' exclusively upon this proposition of performance coming too late after defaidt, its doctrine would be that failure to pay a note on formal demand cuts the debtor off from the right to make payment on the next day, or even a few hours later, and subjects the contract in consideration of which the note was given to annullment; a doctrine which, we imagine, no one would be willing to stand sponsor for.
In Enders v. Gingras, 38 La. Ann. 773, plaintiff was to deliver lumber at an agreed price, and defendants were to deliver furniture. Plaintiff defaulted in his contract, and defendants regularly put him in default. He then went through the forms of putting defendant in default, and, on the strength of it, brought suit to annul the contract. The court found that he himself was in default, and therefore in no position to put the defendant in default. The court cited with approval Moreau v. Chauvin and Morrison v. Wimberly, supra, but the proposition of offer of performance coming too late after default, was not involved in the case. The case did not present the feature of there having been an offer of performance after putting in default.
[19] In Clover v. Gottlieb, 50 La. Ann. 568, 23 South. 459, defendant agreed to sell a plantation which he did not own, and plaintiff agreed to buy it. The date of this agreement was April, 1896, and the price was $5,720. The act of sale was to be passed in March, 1897, and plaintiff was to make then a cash payment of $750. In the meantime, he was to deliver a certain number of horses in part payment. Defendant was *400 to deliver possession on the 1st of January, 1897. A few days after entering into this agreement of sale, defendant secured from the owners of the plantation an agreement to make title to it in his favor or in favor of whomsoever he might designate at any time before March 1, 1897, for $3,300, of which $750 was to be cash on date of sale, and the balance on a credit. Plaintiff delivered the horses according to contract, but when the first day of January came, the plantation had not yet been acquired by defendant, and the plaintiff made repeated demands upon him in vain to deliver, and on the 18th of January made a formal demand for putting in default. The next day he brought suit to annul the agreement of sale, and defendant on that same day tendered possession, and pleaded this tender in defense to the suit. The reason why defendant did not offer sooner to deliver possession is not stated in the decision. It is not said there was a refusal to deliver. The court decided against defendant on the ground that an offer of performance comes too late after putting in default. The court apparently made no inquiry into the soundness of that proposition, but accepted it as axiomatic upon the authority of the cases which we have herein-above been reviewing. If, as stated in the decision, the engagement on the part of defendant was to sell the property of another, and not merely to procure title to the property of another, it was null for the reason that the sale of the property of another is null. Charpaux and Vallette v. Bellocq, 31 La. Ann. 169. But of the ground upon which .the decision was put, that by demanding delivery on the 18th the creditor cut the debtor off from the right to deliver on the 19th, all we can say is that it cannot possibly be sound.
In Woodstock Iron Works v. Standard Pulley Mfg. Co., 115 La. 829, 40 South. 236, the plaintiff, an iron manufacturer, after having ineffectually made repeated attempts to induce the defendant to accept delivery of certain iron called for by the contract, and put the defendant regularly in default, sued in damages for the profit that would have been made under the contract had delivery been accepted; and the authorized representative of the defendant in giving his testimony in the case offered to receive the iron and carry out the contract. The court very properly held that the right to damages which had thus accrued to plaintiff could not be defeated by a tardy offer of performance. But the court went on and dealt with the testimony of the defendant’s authorized representative as if it had been a regular suit against plaintiff to compel plaintiff to deliver the iron, whereas there was no pretense in the case of anything of that kind, but simply an effort to defeat the claim to damages by the tender of a willingness to receive delivery. Had defendant instituted a suit against plaintiff for delivery, plaintiff, doubtless, could have defeated it, not on the ground of putting in default having cut off the right to perform (as a matter of fact there had been no putting of plaintiff in default), but on the ground that circumstances had changed since the time when- delivery was due and was tendered under the contract.
In Johnson v. Levy, 118 La. 447, 43 South. 46, 9 L. R. A. (N. S.) 1020, 118 Am. St. Rep. 378, 10 Ann. Cas. 722, which was a suit against the heirs of a man for his .alleged breach of a promise of marriage, while the court cited approvingly the cases herein-above referred to, and quoted from the case of Moreau v. Chauvin the excerpt herein-above transcribed, it did so merely in support of the proposition that by the putting in default a right to damages accrues to the creditor, and that this right cannot be defeated by any subsequent offer to perform— a proposition founded upon the provisions of the Code upon the subject of putting in de *402 fault and therefore unquestionably sound. But bad tbe defaulter in that case, instead of dying, offered to carry out bis contract,’ plaintiff would bave been in a poor position to sue in damages for breach of promise. Her right to such damages as she bad suffered up to tbe time of tbe offer to perform would, of course, not have been defeated by this offer, and would bave been enforceable,' if for one cause or another no marriage bad taken place; or if a marriage having taken place, such a suit were maintainable by a wife against her husband.
Opposed to tbe foregoing cases is that of Perkins v. Frazer, 107 La. 390, 31 South. 773. In that case plaintiff bad accorded a right of way through bis land for defendant’s irrigation canal, and bad agreed to cultivate a specified number of acres in rice, and to receive and pay for irrigation water from tbe canal. When tbe time came for furnishing water for tbe rice crop of tbe second year of the contract, defendant refused to do so, unless plaintiff first paid a balance ..that was due on tbe water furnished tbe first year; and plaintiff made a formal demand upon defendant for putting defendant in default. In answer to this demand defendant announced that be would not furnish water unless tbe amount due was paid, and plaintiff announced that then be would consider tbe contract to be at an end. Four days later, things being intact, and no barm done, defendant announced that be bad changed his mind and would furnish tbe water. Plaintiff held this offer to bave come too late after default, and cited the cases hereinabove reviewed. Tbe court held that tbe putting in default does not cut off tbe right to perform; that it does not put an end to tbe contract.
That decision is in full accord with tbe Code, and with tbe views of tbe French courts and law-writers on tbe corresponding provisions of tbe Code Napoleon.
[20] Tbe learned counsel for plaintiff cites Murray v. Barnhart, 117 La. 1034, 42 South. 489, where the court repeated this proposition of offer of performance coming too late after default, and gave as authority for it tbe case of Pratt v. Craft, supra. In this Bernbart Case there bad been no putting in default, and what the court decided was that in an oil lease, or, in other words, in a lease whereof tbe consideration is tbe development of tbe land for oil within a fixed date, tbe time thus fixed is of the essence oí the contract in tbe sense of being of so great importance that it is to be presumed tbe parties would not bave contracted without it. Tbe language used in tbe decision, by tbe way, would be applicable to all contracts, but it must be read in connection with tbe facts of the particular case. As said by tbe Supreme Court of tbe United States in tbe case of Bailey v. Baker Ice Machine Co., 239 U. S. 268, 36 Sup. Ct. 50, 60 L. Ed. 275, recently decided:
“According to a familiar rule, * * * this language should be regarded as restrained by the circumstances in which it was used.”
We said we would show that tbe passage from Toullier quoted in Morrison v. Wimberly, supra, was thus quoted in error. Tbe court does not give tbe derivation of the excerpt, and this confirms us in the suspicion that it was taken in blind confidence from tbe brief of counsel, for we are satisfied that if tbe court bad bad before its eyes tbe passage as a whole it would never have quoted it as it did. Tbe quotation is from Nos. 567, 568, and 569 of volume 6. ■ We will transcribe here sufficiently of tbe text to show what' subject Toullier was discussing, and will italicize tbe parts which are quoted in tbe Wimberly Case. It will be seen that tbe point Toullier was dealing with was whether in tbe case of a sale of real estate where tbe contract has stipulated that in tbe event of nonpayment of the price within tbe term agreed on tbe sale shall be dissolved of right; *404 in other words, whether in the case provided for by article 1656 of the O. N. (article 2563 of ours) the debtor is entitled to a “moral delay” after citation in which to- perform. That article, it will be remembered, provides that:
“Art. 2563. If, at the time of the sale of immovables, it has been stipulated that, for want of payment of the price within the term agreed on, the sale should be of right dissolved, the buyer may nevertheless make payment after the expiration of the term, as long as he has not been placed in a state of default, by a judicial demand, but after that demand, the judge can grant him no delay.”
The passage from Toullier, omitting an irrelevant part, reads as follows:
“No. 567. Summary process is available for those contracts authentic in form and importing an order of execution in the name of the king. * * * If the case be one of a sale with resolutory condition, the vendor may, after the accomplishment of the condition, make a legal tender in restitution of the price to the purchaser, and at the same time cause a judicial demand to issue, and a summons to abandon possession in default by which the vendor will be put in possession by the court.
“No. 568. If the contract provides that no putting in default shall be necessary, the purchaser can no longer, after this judicial demand, do away with the effects of the default, nor prevent the resolution of the contract, by offering to pay at the time of the judicial demand. If the contract does not so provide, if it only provides that the contract shall be resolved of right, or from the mere expiration of the term for payment, the purchaser may prevent the resolution by paying immediately, at the moment itself that he is cited. If he does not pay immediately, the resolution of the eontraet accrues in frnor of the venador, without the purchaser being allowed to do away with the default by tardy offers subsequent to the judicial demand.
“No. 569.' However, very estimable jurisconsults have thought that the summons did not have the effect of putting the debtor immediately in default; that its sole effect was to notify the debtor to pay; that a moral delay sufficient to afford him an opportunity to perform had to be allowed- him, and that this delay could not be less than 24 hours. This opinion appears to us to be manifestly erroneous; it is contrary to the text of article 1656 which prohibits the judge from granting any delay after the debtor has -been put in default by a judicial demand— contrary to article 1139 which provides that the debtor is put in default by a summons or other equivalent act, and even without the need of any demand, when the creditor is dispensed from it by the contract; and, finally, it is contrary to the spirit of the Code as manifested by articles 1153, 1657, 1661. The Code has but followed the dictates of reason and of exact justice in desiring that contracts, which are the law of the parties, should be literally carried ou,t. The object of the demand, as we have already observed, is to establish that the debtor is in default, because of his failure to have kept his money ready against the day of payment; it has the same effect as a protest, whieh is nothing else than a demand destined to make patent the failure to pay a note or bill of exchange.”
[21] Thus, it is seen, Toullier was not dealing with ordinary putting in default, which is nothing more than a demand that the debtor do perform, and from the effects of which, except as to those already accrued, the debtor may relieve himself by an offer of performance so long as the resolution of the contract has not -been decreed by a final judgment (the rendering of which judgment is entirely within the discretion of judge in so far as mere time is concerned); but was dealing with the putting in default that results from a citation in a suit in resolution under article 2563, which provides that the debtor may perform so long as a judicial demand has not been made upon him — unrnistakingly implying that after such judicial demand he can no longer perform. That the judicial demand in such a case where the resolutory condition is express and takes place of right has no analogy with the ordinary putting in default in a case where the resolutory condition is merely implied, and takes place only after having been decreed by a final judgment, is perfectly plain; and that the court cited this passage in error, and probably without having read the whole of it but only the quoted part (taken probably from the brief of counsel), is also perfectly plain. Upon such an error as this is this Wimberly decision in part founded. It is also founded upon the obiter dictum in the Moreau v. Chauvin Case, which dictum is the result, as we believe we can show, of a misconstruction of another passage of the same work of Toullier. That passage, transcribed as a whole, reads as follows:
*406 “No. 254. After having seen how the debtor may be put in default we must see what are the effects of the default, and how it may be avoided.
“The effect of the default is to confer upon the creditor an acquired right to the fruits of the thing and to the penalty incurred from failure •of execution, to indemnity or damages, and to the increased value which the thing to be delivered may have acquired since the default if it has perished since then. Before the default there existed only the principal obligation to give, to do or not to do; but from the moment the debtor has been put in default, he is subjected to the accessory obligations of the restitution of the fruits, of the penalty incurred, and of damages.
“No. 255. The creditor having, as an effect of the default of the debtor, acquired a right to the accessory obligations of which we have just spoken, it follows from this that the latter can no longer liberate himself from these obligations by offering to perform the principal obligation; his tardy offers can no longer be received without the consent of the creditor, who has the option either to cause the contract to be resolved, in order to confine himself to the damages resulting from the inexecution, or to demand the execution without prejudice to his right to the damages resulting from the delay.”
While Toullier does say here that the debtor’s “tardy offers can no longer be received without the consent of the creditor, who has the option to cause the contract to be resolved,” and therefore apparently says and apparently means that the putting in default, ipso facto, and presto, as it were, cuts off the right of the debtor to perform, he did not mean, and cannot possibly, have meant, anything of that kind. He had but just detailed what were the effects of putting in default, and in doing so he had not mentioned this one, which would have been the most important of all, the one most obviously needing to be mentioned, if it had been one of these effects. Had he meant anything of that kind he would have been the one solitary jurist in his country entertaining such a view. Read in the light of 'other parts of his own work, and in the light of the writings of the other commentators on the Code Napoleon, this passage loses all ambiguity. He means nothing more than what is expressed in the first part of the same sentence, namely, that:
“The creditor having, as an effect of the putting in default of the debtor, an accrued right to the accessory obligations just mentioned, it follows that the latter cannot liberate himself from these obligations by offering to execute the principal obligation.”
He is here giving his opinion upon a controverted point, some writers having maintained that by performing the principal obligation the debtor relieved himself from these accessory obligations also. When he adds that the creditor has the option of causing the Contract to be resolved, or to insist on performance he is merely stating what the creditors may do in case the debtor does not voluntarily perform after the putting in default. He could not possibly have meant that the calling upon the debtor to perform Would have the effect of destroying his right to perform. Any one reading the whole of his commentary upon this matter of putting in default cannot fail to observe that he has no intention whatever of expressing any dissent from the prevailing sentiment on this p'oint, of the right of the debtor to perform after default, in all those cases where time is not of the essence; and that the sole effect of putting in default is to fasten upon the debtor the consequences of his tardiness, and not to cut off the right to perform. The legal situation after putting in default is expressed by Fuzier-Herman, at Nos. 33 and 34 of note to article 1139, as follows:
“32. The general rule is that the default once incurred by the debtor accrues immediately to the creditor. But the debtor may be released from it either by his own act or that of the creditor.
“33. The default is done away with by the act of the debtor when he makes a real tender to the creditor followed by a deposit. It will be noted, however, that this tender and deposit arrest the effects of the default only for the future and leaves them in full force so far as concerns the past.”
In support of this the authorities are cited, and among them the very passage from Toullier which we have transcribed above. All of the French writers agree that the debtor may prevent the dissolution of the *408 contract by an offer to perform. What they differ on is as to whether the liability fastened upon Mm by the putting in default includes the damages already accrued at the time of the default. See Laurent, vol. 17, p. 135. Carpentier and du Saint, vo. Damages, No. 5, expresses the prevailing opinion 'on that point as follows:
“It is to be noted, however, that consignment arrests the effects of the default only for the future, and, leaves in full force those already accrued at the time of the consignment.”
See Demolombe, vol. 24, No. 533; Duran-ton, vol. 10, No. 448.
And Toullier in the above-transcribed passage means no more than to range himself on that side of the controversy.
[22] It would seem to stand to reason that putting in default can have no greater, or other, effect than to create a legal situation in which a debtor is in default. Now article 1933 provides that:
“When the breach has been passive only, damages are due from the time that the debtor has been put in default.”
And article 1935 provides that:
“The damages due for delay in the performance of an obligation to pay money are called interest.”
And article 1938 provides that:
“All debts shall bear interest * * * from the time they become due.”
It results from these articles, in combination, therefore, that the debtor of a sum of money is in default from the time payment becomes due. Now, if it were true that a debtor in default is no longer in time to perform, would not the logical conclusion be that the debtor of a money debt is no longer in time to pay afte'r the maturity of the debt. This would go to show that a debtor is still in time to perform after he has been put in default.
[23] By article 25G3 of the Code a buyer of real estate who has stipulated in the contract that the sale shall be dissolved of right in ease he does not pay the price within the term agreed on, may nevertheless make payment after the expiration of the term as long as a judicial demand'has not been made upon him, or, in other words, as long as citation has not been served upon Mm. Now, will it be seriously argued that the buyer has this time when the resolutory condition has been expressly stipulated and takes place of right; but that he has not tMs time when the resolutory condition has not been.stipulated but is only implied and does not take place of right, or at all until decreed by a final judgment? If such is the law, vendors may well beware stipulating the resolutory condition expressly, for they are better off if they leave it simply implied. But that such is not the law, and cannot possibly be, need hardly be stated, as it ought to go without saying. Plainly, the distinction is this: That where the resolutory condition has been expressly stipulated and takes place of right, the purchaser has until official demand in which to pay; but where it is 'only implied and takes place only as the result of a final judgment, he has until final judgment in which to pay.
That conclusion is one as to which there is not, and never was, any difference of opinion among the courts and law-writers of France. It is one for the contrary, of which there is absolutely no foundation in the Code; but which, on the contrary, is irreconcilable with those provisions of the Code by which the manner of putting in default is prescribed and the effects of it are declared.
[24-26] The learned counsel for plaintiff argues that because of the defendant’s delays in paying, and because he sought to undermine the title to the property, further time should not be granted him. If defendant were seeking further time, which he is not, the fact that he had been dilatory or delinquent in his payment would not be a reason for not allowing further time. If that were a reason, the same reason would *410 apply in all cases, and the consequence would be that further time would never be granted. As for seeking to undermine the title, we find no foundation whatever in the facts for such an accusation. The facts in that connection are these: Plaintiff’s vendor acquired the property from a Mrs. McQueen, a widow, who had acquired it during her marriage, and during the existence of the community of acquets and gains, without any mention having been made in the act, as we understand, of the acquisition having been made for her separate interest as an investment of her paraphernal funds of which she had the administration, and this apparent flaw in the title having been discovered, defendant sought in a quiet way to discover who and where the heirs of Mrs. McQueen were, so as to perfect the title, if necessary — the property having increased in value as the result both of his improvements upon it and of the natural increase in the value of property in that neighborhood, and he being therefore anxious to perfect the title. This cloud upon the title, and any efforts the defendant may have made to remove it, instead of being a reason for refusing him further time in which to pay, would be a full justification to him for refusing to pay. Article 2557, C. 0. And is a peremptory defense to an action for rescission. 39 Cyc. 1371.
[27] But we repeat, the defendant is not asking for further time. Further time is not necessary. He is simply asking that plaintiff be compelled to accept a tender of payment that has been and is being made to him. There is a vast difference between asking for further time in which to perform a contract, and asking that the plaintiff be compelled to accept immediate and full performance of the contract. In an aggravated case of delay this court, speaking through Justice White, said:
“We see no reason to rescind a sale on the ground of noncompliance with the condition thereof when a full performance is tendered in answer to the suit.” Charpaux v. Vallette & Bellocq, 31 La. Ann. 169.
And, indeed, it would take strong eyes to see any. Eyes strengthened by the desire to profit by the increased value accrued to the property from the improvements put upon it and by natural increase.
The learned counsel for plaintiff does not make the point that the citation of the defendant in the case had the effect of conferring any rights upon his client that the latter did not have before, or of taking away from defendant any rights that he had before ; but we have thought that we might as well note, in passing, that if such a contention were made it would certainly be without merit. There would be found nothing in the Code upon which to base it. The Code attributes such an effect to citation only in the case where the resolutory condition has been expressly stipulated in the act of sale.
The judgment appealed from is therefore set aside, and the plaintiff’s suit'is ordered to be dismissed upon the defendant’s depositing in court, subject to the orders of plaintiff, the amount due the plaintiff in capital and interest, and upon his paying all the costs incurred in this suit up to the time of the tender heretofore made by him to plaintiff. All other costs to be paid by plaintiff.
MONROE, C. J., concurs in the decree. •