### SEWALL et al. v. WOOD et al.

(Circuit Court of Appeals, Third Circuit. February 21, 1905.)

No. 34.

1. SHIPPING—CHARTERS—FREIGHT—WEIGHT OF CARGO.

In an action for breach of a charter party for a shipment of pipe, evidence *held* to sustain a finding that the weight of the pipe shipped, for the purpose of ascertaining the freight, was 3,258 tons, as claimed by the shippers.

2. SAME—CONSTRUCTION.

Where a charter party provided for shipment of a complete cargo of cast iron pipe, "say about 3,400 gross tons," it should be construed as contemplating a margin beyond 3,400 tons, and was not fulfilled by a shipment of 3,258 tons.

3. SAME—PAROL EVIDENCE.

Where a charter party for a complete cargo provided that the ship should receive on board the merchandise "hereinafter mentioned," which was immediately succeeded by a clause providing that the shipper agreed to furnish the vessel a full and complete cargo both under and on deck of cast-iron pipe, "say about 3,400 gross tons," correspondence between the owners and the brokers who negotiated the contract, in which the owners were advised that the shippers had contracted to deliver 3,400 gross tons of pipe to the Dutch government in the Island of Java, and in which the owners represented that the vessel was capable of carrying from 3,400 to 3,500 tons, was admissible to explain the charter; the master having refused to accept more cargo after 3,258 tons had been delivered aboard.

4. SAME.

Where a charter party described the capacity of the ship as about 3,400 gross tons and fixed the freight rate at $8.00 per ton of 2,240 pounds, the representation as to the capacity of the ship should be construed as meaning 3,400 long tons.

5. SAME—DAMAGES.

Where a charter party obligated the ship to receive 3,400 gross tons of iron pipe, and the master refused to receive any more cargo after about 3,258 tons had been loaded, the shippers were entitled to recover the extra

'expense to which they were put in shipping the balance of the cargo to destination.

6. SAME—DAMAGE.

Where the master of a vessel refused to receive more cargo before all of the shipment contracted for had been loaded, whereupon a delay was occasioned to settle the matter, the ship was not entitled to collect demurrage therefor.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 128 Fed. 141.

Henry R. Edmunds, for appellants.
N. Dubois Miller, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the District Court for the Eastern District of Pennsylvania, in a cause of contract civil and maritime. On or about the 16th day of February, 1901, the libelants were under a contract with the Dutch government, in the Island of Java, to supply $3,441^{1097}/_{2240}$ tons of iron pipe, to be delivered to said government in Java not later than the 30th day of November, 1901. The ordinary voyage from Philadelphia to Java, by sail, is about five months. Being under said contract, the libelants, through their brokers, Haldt & Cummins, of Philadelphia, sought to obtain a ship in which to send forward the pipe. The respondents accordingly came into correspondence with said brokers, part of which is set out in the record as follows:

"Bath, February 13th, 1901.

"Messrs. Haldt & Cummins, Philadelphia, Pa.—Gentlemen: Your favor of the 12th inst. at hand, and we note shippers of the Sourabaya pipe are particularly anxious for an earlier ship. We have one that will come around about the latter part of April, but she will carry more than the one due the middle of May. The earlier ship will take about 4,600 tons, to load her, which we presume is more than your parties have to forward. We have nothing else that we can put before you at this time. Should you not find such a vessel as you want at the desired time, perhaps we can treat with you later. Our ship coming around in May is just right for the order. She carries 3,400 tons, and is a fine steel ship insuring at a lower rate than wooden tonnage.

"Yours very truly,                                    Arthur Sewall & Co."

"Philadelphia, February 15th, 1901.

"Messrs. Arthur Sewall & Co., Bath, Maine—Dear Sirs: Your favor of the 13th received. We are unable to interest the Sourabaya pipe shipper in your 3,400 ton ship due in May, for two reasons, first the contract calls for delivery at Sourabaya not later than October, and they fear she may be too late. Second, the pipe will be all ready by April 10th, and as the pipe is valued at $125,000 they will lose the interest on this amount for one month at least, which would mean a loss of $625 interest.

"If you will write us fully in a strain that will allow us to present your letter to the shipper, showing the position of the ship, giving her name, making her capacity as large as possible as the cargo may run slightly over 3,400 tons, and showing when she would probably arrive at Sourabaya, we are sure it would have considerable effect and might influence them to decide to close with you, although we do not think that $9.00 per ton freight can be had, as you know they have been offered a steamer at 36/.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

"Yours truly,                                    Haldt & Cummins."

"February 16th, 1901.

"Messrs. Haldt & Cummins, Philadelphia, Pa.—Gentlemen: Your favor of the 15th inst. at hand.

"The ship we are talking for the Sourabaya order is the 'Kenilworth' now on passage from San Francisco for the U. K. She sailed on November 7th, and allowing ample time she should reach your port by the latter part of May. This certainly ought to put her into Sourabaya during the month of October. She is a fine steel ship. Her cargoes have run from 3,400 to 3,500 tons.

"As regards rate while we feel that our ideas, as previously expressed, are not out of the way, we might endeavor to meet shippers' views and accept $8.50 provided they are inclined to favor the vessel; other terms as named in your letter under date of the 8th inst.

"As regards the larger vessel, it would hardly be practicable to put in case oil in New York, as this being the lighter cargo must necessarily be loaded last.

"Should you be able to work the business, we hope to hear from you promptly.

"Yours very truly,                   Arthur Sewall & Co."

"Philadelphia, March 7th, 1901.

"Messrs. Arthur Sewall & Co., Bath, Maine—Dear Sirs: Your favor of the 6th at hand. We confirm telegram passed between us to-day, resulting in the charter of the ship 'Kenilworth' on the terms of the enclosed charter party, which we trust you will find in order, and if so, please sign same and return to us and we will forward you copies.

"We used every effort to get the terms most favorable in the charter party and succeeded fully to our expectations, and trust you will accept the charter as presented without alterations as it required great effort on our part, to induce Wood's people to close the business on these terms, and fearing that they might insist that the vessel guarantee to carry their exact amount of cargo, a prompter vessel be offered them, or a vessel be offered them at better terms, we prevailed on them to sign the charter party, which closes the deal as far as they are concerned.

"Very truly yours,                   Haldt & Cummins."

The charter party referred to in the foregoing letter, was dated March 7, 1901, at the city of Philadelphia, and stated to be between Arthur Sewall & Co., master and agent for owners of the ship "Kenilworth," of New York, of the first part, and R. D. Wood & Co., of Philadelphia, Pennsylvania, of the second part. It witnesseth—

"That the said party of the first part agrees, on the freighting and chartering of the whole of said vessel * * * unto the said party of the second part, for a voyage from Philadelphia, Pa., to Sourabaya, Java, on the terms following: The said vessel shall be tight, staunch, strong and in every way fitted for such a voyage, and receive on board during the voyage aforesaid the merchandise hereinafter mentioned. The said party of the second part doth engage to provide and furnish to the said vessel a full and complete cargo both under and on deck of cast iron water pipe, say about 3,400 gross tons. * * * And to pay the said party of the first part, or agent, for the use of said vessel during the voyage aforesaid, at the rate of Eight ($8.00) dollars per ton of 2,240 pounds."

The ship arrived in Philadelphia prior to May 10, 1901. Loading of the said ship was at once proceeded with, in due course, until on or about May 9, 1901, when there had been loaded, as claimed by libelants, 3,258 gross or long tons of iron pipe, in accordance with the said charter party. The captain of the said ship then declined to take on any more cargo, alleging that the said ship was then loaded to her full dead weight capacity, and that she could carry no more than was then on

board. He also protested that he had more than 3,258 tons aboard, as the capacity of his ship was greater than that amount, and that his vessel, on a previous voyage, had carried over 3,468 gross tons of grain, with 30,000 feet of lumber extra, for lining, and that there was a mistake in the weight, as she was loaded three inches deeper than she had ever been before. The libelants requested the captain to sign the bills of lading, containing a statement that the ship had only 3,258 tons aboard. This the captain refused to do, although he says he was willing to sign for the number of pipes, but not for their weight. In consequence of this dispute, the ship could not be cleared, and was delayed four days. Finally, the master tendered, and the libelants accepted under protest, a bill of lading, setting out how many pipes had been shipped, "weight unknown. Cargo to be weighed at destination, at master's option, for determination of freight." There was also a clause claiming $868 for four days' demurrage. Under the contract with the consignees, the shippers were to pay the freight. After part of the cargo had been unloaded, the master refused to deliver the balance until he should be paid, not only the freight but also his claim for demurrage. The Dutch officials took the advice of several lawyers, and finally, pursuant thereto, paid the master his full claim. There were no facilities for weighing the pipe at Sourabaya, and the freight was collected and paid upon the marked weight of 3,258 tons.

The consignees, in settling with the shippers for the price of the pipe, deducted, as they were authorized to do under the contract, the amount paid for freight, and also for the demurrage claimed by the master of the ship but the subject of protest by the shippers, and for the fee paid to the lawyers, upon whose advice they acted. In the libel brought by the appellees, claim is made for the amount thus paid for the demurrage and for the fee to lawyers in Sourabaya; also for the extra expenses to which the libelants were put by reason of the necessity of shipping the balance of 183 tons, necessary to fill out their contract with the Dutch government, in other ships.

As to the disputed question of the number of tons actually received on board the ship, the learned judge of the court below found that 3,258 or 3,259 tons, as stated by the shippers, was the correct weight of the pipe delivered by them. He says:

"The important question of fact in the case, as already stated, concerns the capacity of the ship and the amount of cargo that was actually put on board. Here the testimony is in conflict, but I think the libelants' testimony is better in quality and ought to prevail."

This finding of fact must be accepted here, unless manifestly and clearly unwarranted by the evidence contained in the record. We have carefully examined the testimony on this point, and not only find no such inconsistency, but think that it fully warrants the conclusion arrived at by the learned judge. The weight of each pipe was marked thereon, and the testimony of the servants of the shippers who weighed and so marked the pipe, was tendered, and an agreed statement by them was received as evidence. There was no weighing of the pipe at Sourabaya, as there was no opportunity so to do. This testimony as to weight, therefore, remains uncontradicted, except by the statement of the master as to the capacity of his ship, and his opinion and belief

that she was loaded down to three inches below her dead weight capacity, which he believed to be something over 3,500 tons.

It remains to consider whether the court below were right in the construction given by it to the contract between the libelants and respondents, as exhibited in the charter party, and in admitting in evidence the correspondence preceding the charter party, as explanatory thereof, and as containing representations which should be read into and constitute part of the written contract sued upon.

The material parts of the charter party have already been referred to. By its terms, the appellant agreed to receive on board the merchandise "hereinafter mentioned," which, in the immediately succeeding clause, is thus described:

"The said party of the second part doth engage to provide and furnish to the said vessel a full and complete cargo, both under and on deck, of cast iron pipe, say about 3,400 gross tons."

Thus, the cargo, both as to character and quantity, which it was agreed that the ship should carry, is designated. We do not think the words "about 3,400 tons" can be construed as giving the carrier so wide a margin, as to the extent of his undertaking, as nearly 200 tons would be. But, in the view we take of the case presented by the record, the word "about" must be construed as to a margin beyond 3,400 tons instead of less than 3,400 tons. We think the court below were right in admitting the correspondence preceding the making of the charter party, set out in the record and hereinbefore recited. This correspondence presents facts and circumstances surrounding and pertinent to the making of the contract contained in the charter party and out of which it grew. They were necessary to the proper understanding of the terms of the contract, which they in no wise contradicted but only explained, and were not in any wise inconsistent therewith. By this correspondence, the appellants were informed of the fact that the appellees were under contract to deliver a quantity of pipe in Java, on or before a date fixed, and that the cargo to be loaded on the ship might run slightly over 3,400 tons. The letter of appellants, of February 13th, states that the ship offered carried 3,400 tons, and that of February 16th, in reply to one from the shipbrokers stating that the cargo would run slightly over 3,400 tons, stated that "her cargoes have run from 3,400 to 3,500 tons." There can be no doubt that this represented carrying capacity of the ship tendered, was the inducement to the appellees to charter her. The representation was in fact that the ship would carry the quantity of pipe which appellees were under contract with the Dutch government to deliver in Java. It was as much a part of the contract of affreightment, as if it had been written into the charter party. We think this correspondence, therefore, represented a situation, with reference to which the contract between the parties was made, and with relation to which it must be construed, and by which it is neither contradicted nor varied.

The principle here applicable is well illustrated in Mackill v. Wright, L. R. 14 A. C. 106, where there was a contract of affreightment, by which the appellants guarantied that their ship would "carry not less than 2,000 tons dead weight of cargo." With reference to this guar-

anty, it was stipulated that "should the vessel not carry the guarantied weight as above, any expense incurred from this cause to be borne by the owners, and a pro rata reduction per ton to be made from the first payment of freight." By the said charter party, it was agreed that the ship should "load all such goods and merchandise as the said charterers or their agents shall tender alongside for shipment, not exceeding what she can reasonably stow and carry over and above her tackle," etc. Before and at the time of the making of the charter party, the parties thereto had conversations, by which it appeared that the cargo would consist generally of locomotives and locomotive machinery, together with 300 or 400 tons of coal. It would, of course, happen in loading such a cargo, that the larger pieces would occupy stowage room on the ship disproportionate to their weight. At the meeting at which the charter party was signed, "a note unauthenticated by their subscription, or otherwise, was by consent of both parties, written upon its margin, specifying the 'largest pieces' of machinery which were to be included in the cargo by number, weight and measurement." There were to be 23 such pieces in all. As a matter of fact, many more than 23 such large pieces were included in the cargo, and, in consequence, when all the cargo space in the ship was occupied, there was only something over 1,600 tons, instead of 2,000, which he was guarantied to carry. Suit was brought for the lump sum agreed to be paid as freight in the charter party. The shippers, however, contended that they were entitled to a reduction under the stipulation that, "should the vessel not carry the guaranteed weight as above, any expense incurred from this cause to be borne by the owners and a pro rata reduction per ton to be made from the first payment of freight." The owners, on the other hand, insisted that the failure to carry the 2,000 tons guarantied as the dead weight capacity of the ship, was due to the fault of the shippers in loading so many large pieces of machinery as to interfere with the stowage capacity, and they relied upon the understanding, of which a memorandum was made on the margin of the charter party, that only a certain number of large pieces should be included in the cargo. In delivering the opinion of the House of Lords, Lord Chancellor Halsbury used this language:

"That if it could be truly asserted that both parties were acquainted with the nature of the cargo that was to be carried, it would be unreasonable, in construing a mercantile contract of this character, not to suppose that both parties used the general language with reference to the particular subject-matter as to which they were contracting. * * * The marginal note upon the charter party, whether part of the contract or not, seems to me to free the question from all doubt. It certainly was information afforded to the shipowners for the purposes of the contract."

Lord Watson, in delivering a concurring opinion in the same case, says:

"Of course no such inference can be admitted when it is inconsistent with the express or implied conditions of the charter party. But in cases like the present, it is competent to investigate the whole facts and circumstances attendant upon the execution of the charter party, with the view of ascertaining what particular kind of goods, if any, it was then in the contemplation of both parties should be shipped and carried, that being the cargo with reference to which it must be presumed, in the absence of express or implied stipulation to the contrary, that the guaranty was given and accepted."

135 F.—2

In the case at bar, we think the statements contained in the correspondence between the parties prior to making the charter party, had relation to the contract contained in that instrument, were not inconsistent with it, but made clear its terms, and as such entered into and formed part of the written contract. We think the principles in this regard, stated and approved by this court in the case of Bacon v. The Poconoket (D. C.) 67 Fed. 262, require this conclusion. See, also, Clydesdale Shipowners Co. v. Brauer S. S. Co. (D. C.) 120 Fed. 854; Morris v. Levison, L. R. 1 C. P. Div. 155; and Wilfred v. Myers (D. C.) 40 Fed. 170.

It is necessary to notice the contention, that in the references to the carrying capacity of the ship made in the charter party, as well as in the correspondence, a ton of 2,000 pounds, and not one of 2,240, was contemplated, because it was vehemently urged by learned and able counsel. It might suffice to say, with reference to this contention, that the charter party described the capacity of the ship as about 3,400 gross tons, and that in common parlance the word "gross" in this connection describes a long ton, or a ton of 2,240 pounds. This is not admitted by the learned counsel for appellant, but it seems to us that all doubt is removed as to the proper interpretation of these words by the subsequent stipulation of the charter party fixing the freight rate at "Eight ($8.00) dollars per ton of 2,240 pounds." But the question is not properly before us. It was first raised in argument before this court. It appears not to have been raised in the court below, and no assignment of error relating to it appears in the record. Moreover, there was no denial of the allegation contained in the libel, that the "ship sailed on the 13th day of May, 1901, with only 3,258 tons of pipe aboard." Upon the whole case, we agree with the learned judge of the court below, that libelant was entitled to recover from the respondents the extra expense to which they were put in shipping the balance of the cargo to Sourabaya, and also that, as the captain was proved to be wrong in contending that the ship had on board more than 3,258 tons, and in refusing to sign the bill of lading for that quantity, the four days' demurrage therefor, collected by the master of the ship at Sourabaya, should be returned.

The decree of the court below is therefore affirmed.