SOMMERVILLE, J.
Plaintiff brought suit, alleging that he had shipped and delivered to defendant a lot of cotton which the defendant had sold for his account and had collected the proceeds, and refused to pay same to him after demand.
Defendant admitted the shipment by plaintiff of a number of bales and their sale, and averred that the proceeds of such sales had been credited to plaintiff’s account, under a conventional- agreement with plaintiff.
Defendant then set up two contracts between plaintiff and defendant, under each of which the defendant bought from plaintiff 100 bales of cotton, to be delivered between certain dates, at certain fixed prices, and averred repeated demands upon its part that plaintiff comply with his contracts, and claimed of plaintiff, in reconvention, the difference between the contract price of said cotton and its market price on the last date on which delivery could be made under the agreements.
There was judgment rejecting plaintiff’s demands; and awarding judgment to defendant, on its reconventional demand, for the difference between the sales price of the cotton shipped by plaintiff to defendant and the amount of damages due the defendant by reason of plaintiff’s refusal to comply with his two contracts of sale. Plaintiff appeals.
[1] As plaintiff resides in Natchitoches parish, and defendant in Caddo, the latter had the right to sue in reconvention for damages, although the damages claimed were not connected with or incidental to the main demand. C. P. art. 375.
The contracts set out by defendant, upon which the reconventional demand is based, are in writing. The first reads as follows:
“Shreveport, La., April 26, 1916.
“A. J. Ingersoll & Go. have this day bought of F. G. Gallaspy, one hundred (100) bales of spot cotton, nothing below middling in grade, and nothing below seven-eighths (%ths) inch staple, to weigh about 51,500 pounds; at eleven and one-half (11%) cents per pound basis middling, with the prevailing differences on and off middling at the time of delivery, tare not to exceed twenty-four (24) pounds per bale; to be delivered at the Columbia Compress in Shreveport, Louisiana, at any time from September 1st, to December 1, 1916, inclusive.
“Stanley Evans,
“Per pro A. J. Ingersoll & Co.
“F. G. Gallaspy.
“Attest:
“A. B. Costley,
“F. W. Ferdmenges.”
The second contract is like the first, except that the date is May 8, and the price is 12% cents per pound.
The evidence shows that repeated demands were made by defendant upon plaintiff between the dates of his contracts and November 30, 1916, to make delivery. And it was also shown that there was an understanding between Gallaspy and the defendant that all of the money to his credit on account of the sale of cotton shipped by him to Ingersoll *105 & Co. should be left in their hands until he should have complied with his contracts for the sale of the 200 bales of cotton. It is further shown that letters were mailed on the dates they bear, and that on November 17, 1916, defendant wrote to plaintiff:
“It is understood that whatever balance to your credit is to be left with us until completion of your contracts for fall delivery is made.”
And on November 29, 1916, after presentation of a draft by plaintiff on defendant, payment of which was refused, defendant wrote to plaintiff as follows:
“Your draft for $4,526.21 was presented today, and we refused to honor it for the reason that it was understood and agreed between us at the time the purchase of the last 200 bales was made on November 17th, that the balance to your credit was to be left in our hands until you completed your contract for the delivery of 200 bales of cotton; 10O bales sold at 11% cents and 10O bales sold at 12% cents, basis middling, delivered Shreveport.
“As the market now stands, there is a loss on these 200 bales of over $8,000.00, and we expect you to deliver the 200 bales in full before any settlement is made between us.”
Although repeated demands were made upon Gallaspy to comply with his contracts and deliver the two lots of cotton, and, as Gallaspy had confessed that he would be unable to comply with his contracts, and agreed to leave such proceeds on hand as security for the payment to Ingersoll & Co. for the loss on the contracts on which he subsequently defaulted, plaintiff contends that there was not a proper putting in default, not that the mode of putting .in default was improper, but that Gallaspy was not put in default at the proper time.
Plaintiff appears to say that the repeated demands made upon him prior to December 1 amounted to nothing in law, and that the written demand he received on the day prior to the termination of the period of delivery was without legal effect, and that in order that there could be any recovery for a breach of the contracts, it was necessary for Ingersoll & Go. to go through the ceremony of putting in default on December 1, or subsequent thereto.
[2] The statement of this contention is its own refutation.
“To put in default is nothing else than to demand of the debtor that he carry out the contract. The Code expressly says so. * * *
“Laurent * * * says: ‘To put in default is a purely technical expression, meaning that the debtor is tardy in the fulfillment of his obligation, and that he is liable for the damages which the delay may occasion to the creditor.’ ’ * *
“In Taylor v. Chase, 18 La. 91, this court-said: ‘A putting in default * * * is when the party claiming the performance of the contract demands of the other party to carry it into effect.’ * * *
“Putting in default is not a thing invented by the framers of our Code. It was taken by them from the civil law. * * * We there find that putting in default means nothing more, and has no other function than as has been just stated,” Watson v. Feibel, 139 La. 375, 71 South. 585.
In Hafner Mfg. Co. v. Lieber Lbr. & Shingle Co., 127 La. 348, 53 South. 646, the demand for the delivery of the lumber was, as here, made prior to the termination of the period within which the defendant had the right to deliver, and a similar contention was there raised; the court answered:
“The object of putting in default is to let the obligor know that the obligee desires that the contract should be fulfilled at the time prescribed.”
The jurisprudence is uniform to the effect that where the party acknowledges in advance his inability to perform, or expresses his intention not to perform, no putting in default is necessary.
Such, in substance, was the admission of Gallaspy when he agreed to leave the proceeds of the cash sales in the hands of Ingersoll & Co. to be offset against the dam *107 ages which would accrue from his failure to comply with his contracts of sale.
[3] But it is unnecessary to resort to this, since it was only by giving notice prior to the termination of the period of delivery that Ingersoll & Co. expected prompt and literal compliance with the contracts as respects the date of delivery that Gallaspy could have been notified thereof, and putting in default is exacted only for the purpose of securing a square deal to the obligor by notifying him that the creditor expects and demands performance of the obligation.
Plaintiff next contends that the contracts ,were void for uncertainty. The evidence shows the exact value of middling cotton in Shreveport on November 29 and December 31, 1916, on both of which dates middling cotton was worth 19% cents per pound. On that basis, the difference between the contract price and the market price is a matter of simple mathematical calculation, and defendant’s loss for plaintiff’s breach of his contract was correctly figured by the district judge.
[4] It would seem clear that plaintiff was liable to the defendant for the difference between the contract price of the cotton and its market value on the last day on which delivery could have been made under the terms of the contract.
Plaintiff’s counsel argue that there was no contract. Three things, says the Code, are necessary to a sale — the thing, the price, and the consent. O. O. art. 2439. There is written evidence of the consent. That the thing was agreed upon is clear.
What was sold in each case was 100 bales of cotton of an average weight of 515 pounds per bale. Counsel argue that the provision in the contract that the 100 bales of cotton are to “weigh about 51,500 pounds” renders the contract indefinite, contending that the word “about” has the effect of destroying the definiteness of the thing sold.
“The addition of the qualifying words ‘about,’- * * * and the like, * * * is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight.” Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622; Peterson v. Chaix, 5 Cal. App. 525, 90 Pac. 948; Sewall v. Wood, 135 Fed. 12, 67 C. C. A. 580; Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366.
Besides, if any evidence were necessary, it is shown by testimony that the word “about” in similar contracts, in the custom of the cotton trade, has exactly the same meaning as stated by the courts.
[5] There is nothing in the argument that the quantity provided for in the contract is not fixed and determined. Nor is there merit in the contention that any uncertainty is left as to grades.
[6] The cotton sold by Gallaspy in the first contract provided for nothing below middling in grade, and in the second contract, not below low middling. Coupled with the subsequent provision as to allowing for a better grade of cotton at prevailing differences, it is clear what the contract meant that Gallaspy had the right to fill his contract by delivering middling cotton in the one case, and low middling in the other. If he delivered better than middling or low middling (according to the contract), his price was to be correspondingly automatically increased; not according to whim, but according to settled differences in the market price.
However, Gallaspy had the right to fill his contract by making all of his cotton middling. He could not be held to deliver better than middling cotton in the one ease and in the other low middling. Hence, he was without. right to complain if Ingersoll & Go. demanded of him only the grade of cotton called for by the contract, or held him liable only for the nondelivery of such grade of cotton. To call for middling cotton, or low, middling cotton, is to call for as specific and *109 determinate an article as if the contract had provided for clear pine lumber, or for dry salt meat.
The same is true of the contention as to the staple of the cotton to be delivered.
Neither as to grade nor as to staple has Ingersoll & Co. reserved the right of view and trial (C. C. art. 2460), nor was the estimation of the quantity left to the arbitrament of any third person.
The things called for were specific qualities of the article bought and sold, as to which, in the event of dispute in the delivery, the parties could sue and litigate their claims hy the eliciting of testimony in support of their respective contentions as to the quality of the article.
C. C. art. 2458, provides that when goods are sold, as here, the buyer may either require the delivery of them or damages in case of nonexeeution of the contract.
Counsel say the price is indefinite. The price was fixed at 11% cents per pound, basis middling, at Shreveport, the place of delivery, in the one contract; and at 12% cents per pound, basis low middling, in the second contract. If the thing was certain, the price is necessarily certain. In the contract the price is clearly certain, for what was sold was cotton of a grade not below middling, and the middling price was fixed. In the second contract what was sold was cotton of a grade not below low middling, and the middling price was fixed; but there was a mode specified in the contracts by which to get exactly at the price to be paid for the cotton should it be of a quality or staple better than that which the obligor was bound to deliver.
That is certain which can be made certain; and the price is readily ascertained for any grade or staple of cotton better than that called for by the contract.
The cotton was sold'on a basis of the price of middling cotton, not the price of middling cotton on any particular date, but the price of middling cotton as. fixed in the contract. The only element necessary to show the amount of damages is the,, price of middling cotton on the last day the cotton could have been delivered, December 1, and for whatever the difference on that date between middling and low middling the loss is the same. Middling is the standard by which the price is measured, and it is immaterial whether the difference between middling and low middling is one-eighth, one-fourth, or one-half of a cent, the loss on the coAtract is exactly the same, measured by this fixed standard, namely, the price of middling cotton.
The measure of damage is the difference in ^the price of the goods sold according to contract and upon the last day upon which it could be delivered. Hafner Mfg. Co. v. Lieber Lbr. & Shingle Co., 127 La. 348, 53 South. 646; Williams v. Bienvenue, 109 La. 1023, 34 South. 63; Southern Sawmill Co. v. Ducote, 120 La. 1052, 46 South. 20; Woodstock Iron Works v. Standard Pulley Mfg. Co., 115 La. 829, 40 South. 236.
The judgment appealed from is affirmed.
O’NIELL, J,, concurs in the decree.