Plaintiff, Lady Ester Lingerie Corporation, is a manufacturer of ladies' undergarments being organized and doing business under the laws of the state of New York. Defendant, Harry Goldstein Sales Corporation, is a jobber or wholesaler of ladies' wearing apparel. It is a domestic corporation and has its principal office in New Orleans.
Plaintiff sued defendant for $339.27 representing the purchase price of 90 dozen ladies' slips which it sold and delivered to defendant, allegedly in conformity with a certain order given by defendant to its sales representative on May 17th 1941. Defendant admitted the purchase of the 90 dozen slips and that it is liable for the amount claimed by plaintiff but asserted that it is entitled to a judgment in reconvention against the plaintiff for the sum of $381, which would more than offset the claim. And, pleading by way of reconvention, defendant alleged that, on May 17th, 1941, it ordered from the plaintiff 290 dozen slips in accordance with a certain written order given by it to plaintiff's representative; that plaintiff failed to ship to it 200 dozen of the slips so ordered; that, as a result, it was required to purchase from various manufacturers 193 dozen slips at advanced prices so that it could fill orders which it had taken from its customers and that it was obliged to pay, in excess of the amount provided for in its order with plaintiff, the sum of $381 which it fixes as its damage resulting from plaintiff's failure to deliver the entire order.
In view of defendant's concession of liability to plaintiff on the main demand, the only controverted question presented in the lower court was whether defendant was entitled to judgment on its claim in reconvention. After hearing evidence on this matter, the trial judge found in favor of plaintiff and dismissed the reconventional demand. Defendant has appealed from the adverse decision.
It is the contention of defendant that, on May 17th, 1941, it ordered from plaintiff, through its representative, 90 dozen ladies' slips to be shipped at once and that, at the same time and on the same sales slip, it ordered 200 dozen slips which were to be shipped to it on July 15th, 1941. Plaintiff maintains, on the other hand, that its sales representative, one Mac B. Desreau, agreed only to sell and deliver at once to defendant 90 dozen slips; that, whereas its representative inserted upon the order blank an additional 200 dozen slips to be delivered on July 15th, he informed defendant that he was without authority to bind plaintiff for these additional slips for the reason that plaintiff was not accepting any orders for future deliveries.
[1] The evidence submitted by the parties in support of their respective contentions consists of numerous letters exchanged *Page 400 
by them from January 13th, 1941, thru September, 1941. In addition thereto, Desreau testified for plaintiff by deposition and Harry Goldstein, president of defendant, gave evidence in its behalf in open court.
It appears from the correspondence that plaintiff and defendant had been doing business with each other for some time prior to May 17th, 1941, when the sales order now in controversy was given by defendant to plaintiff's sales representative. All of these previous transactions were apparently fulfilled to the complete satisfaction of both parties. On May 10th, 1941, defendant wrote plaintiff advising it to ship 60 dozen slips at the price formerly charged. On May 14th, plaintiff informed defendant, by return mail, that it could not accept this order for the reason that the styles selected by defendant had been discontinued. It further advised defendant that "our Mr. Desreau will be in New Orleans on May 17th at which time he will show you our new line." Thereafter, on May 17th, when Desreau was in New Orleans, he obtained an order from the defendant for 90 dozen slips, which were to be delivered at once, and for 200 dozen slips, which were to be delivered on July 15th. This order was written by Desreau on a sales slip of defendant corporation. He kept the original order in his possession and left a carbon copy of the same with the defendant. On June 6th, 1941, defendant wrote plaintiff requesting that it advise when the slips "recently ordered" would be shipped; that it had received the samples and that it was in great need of the merchandise, having sold a considerable amount of it and having promised delivery daily to its customers. On the following day, June 9th, plaintiff corporation answered defendant's letter and advised it that request had been made of "our factory to make immediate shipment of your order." This letter was signed in the name of plaintiff corporation by "M.B. Desreau". On June 20th, plaintiff again wrote defendant informing it that, because of increasing production difficulties and other matters beyond its control, "we are unable to maintain our usual delivery schedule of your orders, which you were kind enough to place with us." It further requested that defendant bear with it until the situation cleared up. On July 24th, defendant wrote to plaintiff advising it that it had not received any deliveries and stating that, inasmuch as it had sold quite a few of the slips, it must have the goods so that shipment could be made to its customers. On August 13th, defendant again wrote plaintiff that it had just received a shipment of slips and noted that style No. 709 had been sent instead of styles No. 741 and No. 710 which it had ordered. It further called attention to the fact that the shipment was made in two dozen lots, instead of one dozen lots as requested by it at the time the goods were ordered. On August 18th, plaintiff, in answer to this letter, stated that it was at a loss to understand why the shipment had been made in two dozen lots instead of one dozen lots as its factory had specific instructions to the contrary. It further advised that, with reference to styles No. 741 and No. 710, its representative, Mr. Desreau, had told defendant's president, at the time the order was given, that these particular styles would be shipped only if they were available and that, if they were not, a different style would be substituted; that, in checking its records, it had ascertained that, through error, style No. 709 had been shipped instead of style No. 707. On August 22nd, defendant answered plaintiff's letter of the 18th, stating that plaintiff was mistaken when it referred to its order being dated June 10th; that, as a matter of fact, the order was given to Desreau in the early part of May and consisted of 90 dozen slips to be shipped at once and 200 dozen slips to be shipped on July 15th. In this letter, defendant again referred to the fact of the delay in delivery and urged plaintiff to complete the same. On August 25th, plaintiff replied to this letter as follows: "With reference to your claim that we have on (an) order here to be shipped July 15th, please be advised that the only order that we received from Mr. Desreau for you was the portion which was completed on August 18th. However, upon checking with Mr. Desreau, we find that he did ask us whether or not we would accept the additional order from you for later delivery, and we turned it down at the time. He wrote to you direct telling you that the second half was cancelled, and that upon his return to New York, he would take it up with us again, and that he would write to you if it was accepted. However, we again refused this order on his return due to market conditions, and he felt that as he had already wrote you it wasn't necessary to write again."
This was the first time, according to the correspondence, that defendant was notified *Page 401 
that its order for the 290 dozen slips had not been accepted in full by plaintiff. Defendant's president, Mr. Goldstein, maintains in his testimony that no previous notice of plaintiff's partial rejection of defendant's order was given and the correspondence between the parties corroborates his evidence. On September 2nd, Desreau wrote a letter to defendant in which he stated that he was surprised that defendant had not received a letter written by him while he was in Dallas, Texas, in which he told defendant that he was returning the portion of defendant's order (which was to be delivered on July 15th) "inasmuch as they were not excepting (accepting) any future deliveries". In his deposition, however, Desreau, in speaking of that part of the order which was to be delivered on July 15th, stated: "I personally received such an order subject to the approval by Lady Ester Lingerie Corp. This order was never approved. Thereafter with the consent of Mr. Goldstein, I placed order, marked Exhibit 1, with Lady Ester Lingerie Corp., which order was accepted."
[2] It will be readily seen that the testimony of Desreau contradicts the letter which he wrote to defendant on September 2nd. In his letter, he states that he was surprised that defendant had not received a letter supposedly written by him in Dallas, Texas, in which he returned part of the order inasmuch as plaintiff was not accepting any future deliveries. In his deposition, Desreau makes no mention of the letter but would have it appear that he was not authorized to take the order for delivery on July 15th; that such order was subject to the approval of plaintiff and that defendant knew that it would have to be approved. If it be true that it was necessary that plaintiff corporation approve any order taken by Desreau before it would become liable, it seems rather strange that Desreau did not insert this limitation of authority upon the order slip. Far from showing that Desreau's authority to bind it was in anywise restricted, the letters sent by plaintiff to defendant clearly indicate that he was vested with complete power to contract on its behalf. In its letter of May 14th, in which plaintiff advised defendant that it was cancelling a previous order for styles which had been discontinued, it states: "Our Mr. Desreau will be in New Orleans on May 17th at which time he will show you our new line."
Nothing is said in that letter, nor in any subsequent letter, that Desreau did not have the right to bind plaintiff for future deliveries as well as immediate ones. It therefore follows that plaintiff cannot now escape liability for its failure to deliver the goods on the ground that its sales representative was not fully authorized to make a binding contract on its behalf. See Interstate Electric Company v. Frank Adam Electric Co., 173 La. 103, 136 So. 283, and authorities there cited.
We are further of the opinion that Desreau's statement in his deposition that he advised Goldstein, president of defendant, that that part of its order calling for delivery of 200 dozen slips on July 15th would be subject to the approval of plaintiff corporation, is not credible. Goldstein's evidence and the written correspondence in the case convinces us that defendant corporation was led to believe that the goods would be delivered and that the first notice it ever had that plaintiff did not intend to comply with its order in full was on August 25th, 1941. Hence, we hold that plaintiff has breached its contract and is liable for the damages sustained by defendant.
Before we discuss the measure of damages to be awarded to defendant, we note that plaintiff's counsel objected, in the District Court, to the admission of any evidence in support of the reconventional demand on the ground that the allegations contained therein were too vague and indefinite to authorize the submission of proof. This objection was overruled by the court. In their brief filed in this court, counsel for plaintiff again mention their objection, which they claim was well founded, but they also inform us that "we are not standing on this legal ground." Accordingly, we take it that this point has been abandoned although some authorities are cited by counsel in support of it.
[3] Coming now to the question of the damages sustained by defendant, we first direct our attention to the allegations of the reconventional demand. It is claimed by defendant that, because of plaintiff's failure to deliver all of the goods ordered by it, it was required to purchase similar merchandise from other manufacturers in order to make delivery to its customers in accordance with previous orders which *Page 402 
it had accepted from those customers on the strength of plaintiff's acceptance of its order of May 17th, 1941. It, however, does not seek to recover the profit which it would have made on the resale of the merchandise to its customers but only for the difference in the price which it agreed to pay plaintiff for the goods ordered and the price it was compelled to pay other manufacturers for similar goods. In other words, defendant is claiming, as damages for breach of the contract, the difference between the contract price and the market price of the merchandise. This is the universal rule governing the measure of damages to be allowed a purchaser in cases such as this. See Kohlman v. Witherell Dobbins Co., 155 La. 57, 98 So. 756, and cases there cited.
Counsel for plaintiff state in their brief that "the appellant claims damages on the theory that the failure of the appellee to fulfill the second part of the order caused him to purchase goods on the market to fulfill his contracts." It is true, as stated by counsel, that this theory is advanced by defendant in its reconventional demand. However, we think that the allegations to that effect may be treated as surplusage inasmuch as defendant is not claiming its loss to be the profit which it would have made on the resale of the goods to its customers. It is also plain that, if such a claim had been asserted by defendant, it could not be sustained for the reason that there is neither allegation nor proof to show that the sale made by plaintiff to defendant was predicated upon a resale of the merchandise by defendant to its customers. Hence, any damages for loss of profits, which are permissible under Article 1934 of the Civil Code, were not within the contemplation of the parties.
In Hafner Mfg. Co. v. Lieber Lumber Shingle Co.,127 La. 348, 53 So. 646, 647, the plaintiff, in suing defendant for breach of contract on a sale of lumber, alleged in its petition that it had contracted with other persons to sell them the lumber to be supplied by defendant; that this fact was well known to defendant and that, by defendant's failure to comply with its contract, it is required to buy other lumber at advanced prices to fill its commitments to other persons. In view of this allegation, the defendant filed a plea of estoppel averring that, since plaintiff had judicially admitted that it had contracted with other persons to sell the lumber to be supplied by defendant and that this fact was well known to defendant, plaintiff was estopped from claiming as damages the difference between the contract price and the market price of the lumber and that it was entitled only to recover whatever profit it would have made on the resale of the lumber to other persons. Defendant's plea was overruled by the lower court and, on appeal, the Supreme Court found that the trial judge's action was correct. The opinion states: "The allegation in question neither adds to nor detracts from the cause of action as otherwise set forth in the petition. Strike it out, or leave it in, and the petition remains exactly and precisely the same in legal intendment and effect. The allegation is mere idle verbiage. What contracts plaintiff may have had, or not had, with third persons with reference to this lumber, and what knowledge the defendant company may have had or not had of such contracts, is utterly immaterial, so long as no allegation is made that the contract sued on was made with reference to such other contracts; and no allegation of that kind is now made. The petition does not purport to charge the defendant company with a different obligation from that which would have resulted from the contract sued on if said other contracts had not been made."
Applying the foregoing reasoning to the situation presented in the case at bar, it will be at once seen that, although defendant claims that it was required to purchase similar merchandise from other manufacturers as a result of plaintiff's failure to deliver the 200 dozen slips in accordance with its order, it does not pray for its damages to be measured by the profit it lost by reason of plaintiff's breach, nor does it allege that its order with the plaintiff was predicated on the commitments which it had made to its customers. On the contrary, the damages sought to be recovered are based on the difference between the contract price contained in its order and the advanced price which it paid to other manufacturers for similar goods.
[4, 5] As stated above, the universal rule with respect to the measure of damages for breach of a contract such as this is the difference between the contract price and the market value. And the authorities hold that it is not necessary for the injured purchaser to actually replace the goods bought under the contract by subsequent purchases on the open market. See Kohlman *Page 403 
v. Witherell Dobbins Co., supra; Gallaspy v. A. J. Ingersell Co., 147 La. 102, 84 So. 510; Bonsor Co. v. Simon Rice Milling Co., 151 La. 1094, 92 So. 711, and other kindred authorities.
In the case at bar, it is shown that defendant, between July 2d 1941, and January 5th, 1942, purchased from other manufacturing concerns 248 dozen slips similar in quality to those purchased from plaintiff on May 17th, 1941, at prices approximating $2 per dozen slips higher than the price quoted by plaintiff. Defendant's president, Mr. Goldstein, stated on the witness stand that all of these purchases were made for the purpose of filling orders of resale which defendant had made with its customers on the strength of the order of purchase placed with plaintiff. Obviously, the witness is mistaken in his testimony inasmuch as many of the purchases were made prior to August 25th, 1941, which is the date on which defendant became advised of the fact that plaintiff had refused its order for the delivery of the 200 dozen slips. But this statement of Goldstein is of no importance to the determination of defendant's damages — for, as above pointed out, the measure of damages recoverable is the difference between the market value and the contract price and it is not material whether the goods were purchased in order to meet commitments to defendant's customers or not.
[6] The evidence plainly establishes that there was a considerable advance in the price of ladies' slips from May 17th, 1941, to July 15th, when plaintiff was required to deliver the merchandise in accordance with defendant's order. It is shown that, on July 22d 1941, defendant purchased similar merchandise from Brighton Undg. Co. at $6.75 per dozen slips as compared to the contract price quoted by plaintiff of $4.75. This purchase was made at a time in close approximation to the date when plaintiff should have delivered the slips ordered by defendant and substantially establishes the market value of the slips at the time of the breach. Hence, the damages sustained by defendant is the difference between $4.75 per dozen slips and $6.75 per dozen or $2 per dozen on 200 dozen slips. This amounts to $400. However, since defendant fixes its damage to be $381 in its reconventional demand, recovery will be limited to that amount.
For the reasons assigned, the judgment of the trial court in plaintiff's favor on the main demand is affirmed. But the judgment dismissing defendant's reconventional demand is reversed and it is now ordered, adjudged and decreed that there be judgment in reconvention in favor of Harry Goldstein Sales Corporation, plaintiff in reconvention, and against Lady Ester Lingerie Corporation, defendant in reconvention, in the full sum of $381 with legal interest thereon from judicial demand until paid. The costs of this appeal are to be borne by Lady Ester Lingerie Corporation. The costs in the District Court shall be divided equally between plaintiff and defendant.
Affirmed in part.
Reversed in part. *Page 426