McBRIDE, Judge.
This suit was instituted by plaintiff, Henry Pepper, against H. Katz, a commercial copartnership and its component partners, for damages arising out of breach of contract. Plaintiff alleges he purchased three “Day-Nighters” from H. Katz who failed to make delivery thereof and prays for a judgment for $346.81 against all defendants, in solido, this amount representing the difference of $336.81 between the price at which he purchased the articles and the price which he had to pay for the identical articles elsewhere, plus the sum of $10, which is the alleged loss sustained when plaintiff repurchased certain beds he had disposed of upon entering into the contract with H. Katz.
The defense is that while the customer’s order did stipulate plaintiff’s purchase of three Day-Nighters, which is a trade or brand name used by Slumber Products Corporation of Memphis, Tennessee, the term Day-Nighter is widely used with reference to any and all kinds of sofa beds, which fact plaintiff well knew, and that he also understood that he had ordered and was purchasing three sofa beds which H. Katz had in stock, these having been manufactured by another concern.
Plaintiff recovered a judgment for $10 in the lower court from which he has appealed. Defendants have answered the appeal praying for a reversal of the judgment and for the dismissal of the suit.
H. Katz is engaged in the retail furniture sales business; it purchased the bankrupt stock of another furniture dealer and placed this stock together with certain other furniture and fixtures from its own store in the premises 1416 Frenchmen Street, from which H. Katz conducted a “warehouse sale” which was given publicity by advertisement in local newspapers.
Plaintiff, who operates an apartment house, was attracted by the advertisements and on June 15, 1952, in company with his wife, visited the Katz establishment. Plaintiff says his only purpose was to buy some refrigerators for use in his apartments; however, he states that after placing an order for three refrigerators with Irving Bassin, the salesman, Bassin “talked him into” purchasing three Day-Nighters at a price of $80 each.. Plaintiff testified:
“ * * * In other words I didn’t need the Day-Nighters. I didn’t go there to buy Day-Nighters. I went there to buy refrigerators and the salesman talked me into taking Day-Night-ers at that price and anyone would be a fool not to.”
Plaintiff knew the usual retail price of Day-Nighters for he had purchased them in the past and had paid $180 for each of them. Plaintiff’s story is that Bassin told him he did not have the Day-Nighters in the warehouse but he could secure them and would make delivery thereof to plaintiff. Bassin showed plaintiff some sofa beds with built-in matresses and stated while those particular sofa beds were not Day-Nighters he could fill the order as he could get Day-Nighters at any time. He mentioned that he had previously made a sale of Day-Nighters to a lady who lives on Canal Street.
Plaintiff’s wife corroborates her husband’s testimony in practically every detail.
The salesman, Bassin, was never produced as a witness, but we think defendants have satisfactorily shown that the salesman’s whereabouts were unknown and he could not be summoned, so, therefore, the usual presumption against a litigant who fails to produce a material witness does not arise against defendants in this case.
However, three other witnesses testified on behalf of defendants. They say they were in the store when the transaction was *893 made; two are members of the partnership and the other a lady employee. They claim that after the salesman had written out the “purchaser’s order” and had brought it to Mr. Julius Katz for approval, Mr. Katz informed both Bassin and the plaintiff that H. Katz did not handle Day-Nighters but had in stock another type of sofa bed, three of which were shown to plaintiff who agreed to accept them. The lady employee and the other partner state they heard both Mr. Katz’ statement and plaintiff’s assent to accept the sofa beds. Plaintiff and his wife on the other hand deny this testimony of the defense witnesses.
The argument is advanced that plaintiff well knew that he could not expect delivery of genuine Day-Nighters because the price, $80, to his knowledge, was much less than the price brought by Day-Night-ers at establishments which dealt in them. But it must be remembered that plaintiff was attending a “warehouse sale” and undoubtedly the advertisements carried the information that prices on the merchandise in the warehouse were greatly reduced. Plaintiff intimates he was surprised when Bassin quoted the low price to him, but as he states:
“ * * * the salesman talked me into taking Day-Nighters at that price and anyone would be a fool not to.”
Mr. Katz testified that there were no Day-Nighters on hand when plaintiff attended the sale:
“ * * * We have never handled any Day-Nighters before or since. We never even purchased a Day-Nighter. The truth is I never even seen a Day-Nighter. The only Day-Nighter I’ve ever seen is what is in the newspaper. * * * I’ve never seen one, we’ve never carried one, we’ve never handled one. * * * ”
Yet, after asserting that he had never even seen one, this same witness, at a later point in his testimony, was able to give certain concrete information' about a Day-Nighter :
“I can answer your question by saying that the Day-Nighters have a label under the pillows as you pick them up. There are 2 pillows and there is a label which says Day-Nighter, Made by Slumber Products, * *
This defendant sought to impress upon the court that the words “Day-Nighter” have become a generic term embracing all kinds and types of sofa beds, just as the word “frigidaire,” which is a trade name, is used in connection with almost any. kind of refrigerator, and just as “deep freeze” is used when referring to a frozen food locker. In this connection, it is interesting to note that plaintiff, in addition to ordering the three Day-Nighters, also purchased three refrigerators, which are not referred to as “frigidaires” but are listed as “2 9C Ranier Refrigerators” and “1 9F Ranier Refrigerator.” Why, we ask, if the salesman meticulously filled in the correct brand name of the refrigerators on the purchase slip, he could not as well have inserted thereon the correct brand name of the three “Queen City” sofa beds which defendants insist plaintiff had purchased?
There is another circumstance which appears to have some significance. Mr. Katz, whose testimony has been quoted from above, is an experienced businessman, and we fail to understand why, if plaintiff had not purchased Day-Nighters, the purchase order was not corrected when it was presented to him for approval of plaintiff’s credit. Mr. Katz, it is shown, gave his approval at a time subsequent to the conversation he said was had between the plaintiff, the salesman, and himself and in which he maintains he informed both plaintiff and the salesman that H. Katz did not sell Day-Nighters.
There is also a feature of the transaction which is most difficult to comprehend and that is that the “customer’s invoice,” which is in a different handwriting and is dated June 16, 1952, the day after the purchase order was given, also lists the item “3 Day Nighters, Plastic, Red-Green-Beige $240.-00.” The installment payment book issued *894 to plaintiff at some subsequent date, which is in evidence, also carries under the caption “Goods Purchased” the typewritten notation “3 Day Nighters, plastic Red-green-beige $240.00.”
After reading and analyzing the testimony and carefully considering the surrounding circumstances, we can come to but one conclusion and that is that plaintiff ordered and Bassin, acting for H. Katz, sold and agreed to deliver to him three beds bearing the trade name Day-Nighter with matresses at a price of $80 each. We are well satisfied that the purchase order written by the salesman was accepted and subsequently ratified by Mr. Julius Katz representing his firm. Default in delivery is Slot questioned; H. Katz refused to deliver three Day-Nighters as called for by the sales agreement and plaintiff refused to accept any other type of sofa bed.
The LSA-Civil Code provides:
Art. 2485. “If the seller fails to make the delivery at the time agreed on between the parties, the buyer will be at liberty to demand, either a canceling of the sale, or to be put into possession, if the delay is occasioned only by the deed of the seller.”
Art. 2486. “In all cases, the seller is liable to damages, if there result any detriment to the buyer, occasioned by the non-delivery at the time agreed on.”
Article 1934 reads in part:
“Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:
“1. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. By bad faith in this and the next rule, is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will.”
The Supreme Court on numerous occasions has pointed out that the measure of damages for the breach of a contract of sale of personal property, where no fraud is shown, is the difference between the contract price and the market price of the goods on the date the delivery should have been made. See Palmer v. Smith Co., 165 La. 288, 116 So. 186; Mutual Rice Co. of Louisiana v. Star Bottling Works, 163 La. 159, 111 So. 661; Garrison & Son v. Sheriff Hardwood Lumber Co., 156 La. 147, 100 So. 253; Kohlman v. Witherell & Dobbins Co., 155 La. 57, 98 So. 756; National Wholesale Grocery Co. v. Simon Rice Milling Co., 152 La. 1, 92 So. 713; Gallaspy v. A. J. Ingersoll & Co., 147 La. 102, 84 So. 510; Crescent Furniture & Mattress Co. v. Klump & Co., 4 La.App. 585; Jefferson Cotton Oil Co. v. Archibald Gin Co., 3 La.App. 391.
In Friedman Iron & Supply Co. v. J. B. Beaird Co., Inc., 222 La. 627, 63 So.2d 144, 149, on rehearing the Court said:
“ * * * This rule of law is based on solid grounds because neither a plaintiff nor a defendant should be permitted to select the market value of a date different from that on which the contract was breached for the purpose of determining whether any loss was suffered or profit deprived to the detriment of either party. * * * ”
Plaintiff has attempted to fix his damages at the difference between the contract price and the price he was forced to pay for three genuine Day-Nighters elsewhere, namely, $584.01, the difference being $336.81.
This formula cannot be used to measure plaintiff’s damages for the reason that he did not purchase the Day-Nighters from the other concern until August 8, 1952, or nearly two months after the date H. Katz should have made delivery. If a plaintiff were to be permitted to use the market price at such a remote time, the rights of the parties in a *895 suit such as this would depend on conditions arising at an uncertain future date and after there may have been wide fluctuations in the market.
Were it not for certain testimony which emanated from an expert witness placed on the stand by the defendants, we would he compelled to say that plaintiff, by merely showing his purchase of the Day-Nighters on August 8, 1952, had not succeeded in establishing the amount of his loss and damage, and, therefore, could not be allowed to recover.
The witness referred to is a Mr. M. D, Hornsby, a specialty salesman of sofa beds and sleeping equipment, and his testimony is that he was entirely familiar with the retail prices prevailing on June 15,1952, and Day-Nighters without mattresses were being sold at retail on that date at anywhere from $115 to $125 and that the mattresses were bringing a price at from $29 to $59. We believe the lower extremes of the prices should be used as a basis for determining the market price for the purpose of computing the amount of plaintiff’s recovery. Therefore, the market price of three Day-Nighters and mattresses as of the crucial date, that is, the date of delivery, was $432, while the contract price was stipulated as $240, or a difference of $192, which should be the amount of the judgment.
We are not cognizant of any jurisprudence existing in this State which requires, upon breach of a contract for the sale of personal property, that the purchaser is compelled to go out on the open market and buy like goods in order to establish the amount of his damages. If a purchaser were required to do this, then it would follow that when he could not buy like goods on the market he would be utterly unable to assert any claim for damages because it could be said that he had been unable to determine the amount thereof in accordance with the formula established by law.
In Burglass v. J. C. Healy Co., 159 La. 393, 105 So. 384, 385, the plaintiff made a claim for damages by reason of the nonful-fillment of a contract to deliver furniture which had been purchased. In that case the plaintiff claimed as damages the difference between the contract price and the market price on the delivery date, and that criterion was the one adopted for establishing the damages. The Court had this to say:
“ * * * If plaintiff had gone into the market, and there is no proof in this record that he did so, and had bought furniture, his damages would have been the difference between the purchase price and the price he was compelled to pay for it. Plaintiff has offered three witnesses who testify to the market price of the furniture in New Orleans on the dates delivery should have been made. * * * The four sets which should have been delivered on July 5, 1919, were worth on that date $852, and the ten sets which should have been delivered on September 30, 1919, were worth on that date $2,440, making a total of $3,292, from which must be deducted the contract price of $2,520, leaving a balance of $772, which is the damage suffered by plaintiff and for the recovery of which he is entitled to judgment. * * * ”
Plaintiff also claims another item of damages and that is for the ten-dollar loss sustained in repurchasing certain beds which he had sold. It appears that after entering into the sales agreement with H. Katz, plaintiff, expecting delivery of the Day-Nighters, sold three beds which were used in his apartments, and upon the default of H. Katz in making delivery of the Day-Nighters, he sought out the person to whom he had sold his beds and repurchased them at an increased price of $10. We do not think this item can properly be allowed as it cannot be said that this type of damage was within the contemplation of the parties at the time the sales agreement was entered into.
For the reasons assigned, the judgment appealed from will be increased to the sum of $192 and affirmed.
Defendants are to pay the costs of this appeal.
Amended and affirmed.