236 So.2d 892 (1970)
Ila D. THOMPSON, Plaintiff-Appellee,
v.
Raymond R. BULLOCK, Defendant-Appellant.
No. 3074.
Court of Appeal of Louisiana, Third Circuit.
June 18, 1970.
Rehearing Denied July 24, 1970.
*893 Camp, Carmouche, Palmer, Carwile & Barsh, by Maurice L. Tynes, Lake Charles, for defendant-appellant.
Kaufman, Anderson, Leithead, Scott & Boudreau, by Everett R. Scott, Jr., Lake Charles, for plaintiff-appellee.
Before TATE, FRUGE, and HOOD, JJ.
TATE, Judge.
Mrs. Thompson, the plaintiff, sues to annul two almost identical contracts. By them she agreed to sell certain immovable property to the defendant, Bullock. She contends that Bullock failed to comply with the terms of the two contracts. The trial court granted judgment in her favor.
Bullock appeals. He principally urges that the trial court erred in finding that he breached the agreement. Alternatively, he suggests that, instead of terminating the contracts, the trial court should have allowed him time to remedy and default. Bullock further complains of the trial court's failure to allow him judgment upon his reconventional demand, insofar as it prayed for recovery of all sums paid upon the principal indebtedness, in event of rescission of the agreement.
Facts
The present suit (Docket No. 3074) is to cancel an agreement of January 5, 1967 by the plaintiff, Mrs. Thompson, to sell to Bullock a complex of eight apartments on Second Street for $60,000, to be paid at $500 per month. A companion appeal this day decided (236 So.2d 899) concerns her similar demand for cancellation of an agreement of January 20, 1967, to sell an Aster Street sixteen-apartment property for $120,000, payable at $1,000 per month. The issues of both suits are the same and are discussed by this opinion.
*894 No downpayment was required under either agreement. The purchaser, Bullock, was to go into possession of both properties immediately. However, as part of the consideration, he assigned to the seller all of the rents and revenues from the apartments. In each agreement, Mrs. Thompson agreed to execute a formal act of sale when a stipulated sum had been paid on the principal.[1]
In view of the purchaser's small equity in the properties, certain stringent security provisions were included.
Bullock was required to deposit all of the rents from each property in a separate escrow account.[2] The agreements further provided that the excess over the monthly contract payments of $500 and $1,000 respectively were to be "used for the payment of taxes, insurance, and reasonable repairs and upkeep upon" the respectively described premises.
The Aster Street agreement further provided that any excess over these payments, and of the premiums for the credit-life insurance policy (required of the purchaser by that agreement), could be withdrawn by Bullock.[3] (The Second Street agreement provided no authority for withdrawl of excess revenues.)
The agreements further provided that, if the monthly contract installments, taxes, or insurance advances were not paid when due, or "if Vendee shall, in any other manner violate his covenant hereunder, then all Vendee's rights under this contract shall be forfeited by him * * *." Each contract provides, however, for a thirty-day grace period for Bullock to cure any default.
After several prior disagreements involving Bullock's failure to pay utilities when due and his failure to account for rent monies received, Mrs. Thompson formally notified him by letter of November 1 that he was in default of six obligations under each contract.`The letter required him to correct the defaults within thirty days after date, or thereafter immediately to surrender each property by December 4, 1968.
The defaults included his failures (a) to maintain separate escrow accounts for each property, (b) to deposit into each account and reflect proper balances that had accumulated in excess of the requisite payments, (c) to maintain insurance on the properties and on the purchaser's life in the amounts required by the contracts, and (d) to manage each property as a prudent administrator, since he failed to pay currently for utility services.
Trial Court Rulings
Following a first trial and oral reasons, judgment rendered following it, Bullock cured all deficiencies except the first two. As to these two the trial court had held on its first hearing: (a) That the evidence did not preponderantly prove the defendant's failure to collect and deposit all rents when due; and (b) That the requirement of maintaining separate accounts had been waived by mutual oral agreement between the parties.
The plaintiff applied for a new trial. Her motion for a new trial was granted.[4]
*895 Further evidence was introduced on this second trial. The district court then reached a different conclusion as to each issued and granted judgment to the plaintiff, Mrs. Thompson, annulling the agreements.
As to the first issue, the court pointed out that the requirement of each contract for a separate escrow account was a part of a written agreement by authentic act for the sale of immovable property. Such contracts must be in writing and cannot be amended or varied by parol. Civil Code Articles 2275, 2276, and 2462.
The court held that parol evidence, even of subsequent oral agreements, is inadmissible to contradict, vary, or modify such instruments. Stack v. De Soto Properties, Inc., 221 La. 384, 59 So.2d 428; Harrell v. Stumberg, 220 La. 811, 57 So.2d 692; Hoth v. Schmidt, 220 La. 249, 56 So.2d 412; Di Cristina v. Weiser, 215 La. 1115, 42 So.2d 868; Barchus v. Johnson, 151 La. 985, 92 So. 566.
As to the second complaintthe diversion of rental monies to personal use in violation of agreementthe trial court held that at the end of November, 1968, Bullock had withdrawn at least $728.67 for personal use, although over $2,000 of property taxes were due on the property as of December 1, 1968, or at the time the thirty-day grace period expired on December 5.
Diversion of Rentals to Personal Use
We find no error in the trial court's factual finding that Bullock had breached the security provisions of the contracts by retaining rental funds for his personal use, either by withdrawals or by not depositing them.
Our own analysis of Bullock's confusing and selfserving testimony is based on his records erratically maintained. We reach conclusions essentially in accord with the analysis of the appellee's brief, which shows some thirteen-fourteen hundred dollars of 1967 and 1968 rentals not accounted for.
However, even accepting Bullock's own testimony of debits from these rentals to payments to himself, his own testimony (most favorably construing his accounts) shows that he withdrew $656.78 of the 1968 revenues from both properties for his personal account. Tr. 196-97.
The net balance remaining in the escrow account from rental for both properties was $221.60 on December 1, 1968. At this time, property taxes in the amount of $2,399.53 were due on the properties.
Whether the rentals not deposited (or else withdrawn) were attributable to the Aster Street or to the Second Street properties, in neither instance was Bullock authorized to divert them to personal use. Under the terms of neither contract was any excess available for his personal use unless all taxes and other expenses of the property were paid.
Bullock's counsel skillfully, but unsuccessfully, attempts to explain these diversions of rentals as justified.
For instance, the defendant, Bullock, admits failing to deposit $432.50 of November rent checks into the escrow account. He claims that he did not do so because of the judicial seizure of his interest in the properties (by a judgment creditor who is a third party to these proceedings), but that he used these funds to pay current property expenses; he allegedly was forced to do so because payments for these expenses, drawn on the escrow account, had been stopped because of the judicial seizure of his interest in such account.
However, his testimony explaining these expense payments specifies them as ten small items totalling $124.99. See Tr. 192, Tr. 195-196. Thus, he diverted at least three hundred dollars of the November rentals to his unexplained personal use.
Again, Bullock explains withdrawal of $200 as for deposit in a special tax escrow account (of unspecified location and not authorized by the agreements). Even if *896 the testimony is accurate, he subsequently admits these funds were diverted to pay his personal income taxes, Tr. 360-62. Under the terms of the agreements, the use of rental monies for payment of taxes on the property was required; but no diversion was authorized for the purchaser's own personal income tax.
We therefore find clearly proved that, in addition to failing to maintain separate accounts for each rental property, the defendant, Bullock, breached the agreements by diverting rental revenues to his own use instead of depositing and maintaining them in the escrow account(s) for expenses of the properties.
Should the obligor be given an opportunity to remedy the breaches?
Alternatively, Bullock contends that, instead of terminating (dissolving) the agreements, the trial court should have granted him a reasonable time within which to remedy the breaches. He relies upon Civil Code Article 2047.[5]
By virtue of this article, the court is authorized within its sound discretion, "according to circumstances", to allow further time for performance of a condition breached, rather than to dissolve the contract. Except where exercise of this discretion is prohibited by law,[6] the Code entrusts to the sound discretion of court the allowance of further time to perform, in all cases where dissolution of a commutative contract is sought because of a breach of a resolutory condition. Southport Mill v. Ansley, 160 La. 131, 106 So. 720; Watson v. Feibel, 139 La. 375, 71 So. 585; Monroe, The Implied Resolutory Condition for Non-Performance of a Contract, 12 Tul.L.Rev. 376 (Part I), 509 (Part II), esp. 390 et seq. (1938); Aubry and Rau, Obligations, Sec. 302(4) (Civil Law Translations, LSLI, ed. 1965).
In pure theory, when there is an express resolutory condition in the contract, the resolution takes place as of right upon the occurrence of this condition: There is no occasion for judicial discretion to extend the time for performance, because by will of the parties they have excluded "the judicial resolution" of their contract. However, at least formerly, the French courts strictly interpreted conditions alleged to be express resolutory clauses so as to retain judicial discretion, see Planiol Civil Law Treatise, Volume 2, Section 1324 (LSLI Translation, 1959), although the later French decisions may construe such a clause as valid whenever it follows from the party's language that they did not intend the avoidance of resolution by any judicial allowance of more time to perform, 6 Planiol et Ripert, Traite pratique de droit civil francais 587-589 (2nd ed. by Esmein, 1952); also in 2 Carbonnier, Droit civil, 550-553 (1957); Carbonnier, Theorie des obligations 310-313 (1963) and 2 Colin et Capitant, Cours elementaire de droit civil francais 176-180 (10th ed. by Julliot de la Morandiere, 1953).
The present agreement provides that, if the Vendee violates his covenants under the contract, "then all Vendee's rights under this contract shall be forfeited by him * * *". This contract is open to a possible interpretation that it is an express resolutory condition. In effect, the language of the parties might be viewed as indicative that they did not intend to wait *897 until a court with probably crowded dockets decided to resolve their contract (if it did), but that instead they had determined the contract should be resolved as of right upon violation of any of its convenants.
We pretermit decision at this time whether, as a matter of law, an express resolutory condition desprives a Louisiana court of its discretion to allow further time for performance under Civil Code Article 2047, and we further pretermit whether the particular clause in question should be construed as being an express resolutory condition.
For even if, in the present instance, the court does have discretion to allow further time for performance, the trial court properly decreed dissolution in accordance with the plaintiff's prayer, rather than allowing the defendant further time in which to remedy the particular breaches now at issue (failure to maintain two accounts, diversion of rentals to personal use).
In the first place, the diversion of rentals, particularly, was a substantial breach of a condition which was undoubtedly part of the cause or motive, Civil Code Article 1896, for Mrs. Thompson's executing the contract.
She transferred possession and agreed to sell these substantial apartment properties to Bullock, without requiring any downpayment from him. Rather than collect the rents and manage the property herself, she transferred it to himhowever, as an express condition of the contract to secure her interest, he agreed to assign these rents to her, to deposit them when received in escrow accounts, and to use them to pay her and to pay expenses of the property. Not until he had a substantial equity in the properties was title to them to be transferred to him.
In the second place, the defaulter Bullock's actions in failing to account for or restore the diverted monies showed a gross breach of the good faith required of performance of contractual conditions, Civil Code Article 1901. (So did his various other breaches and delinquencies during the life of the agreement, such as his repeated failure to explain and reconcile to Mrs. Thompson the rental revenues and expenses until after suit.)
By letter of November 1, 1968, Mrs. Thompson formally demanded that he deposit by December 4 all rentals in excess of contract and expense payments. By judicial demand of December 9, she prayed for dissolution of the agreements, because of his failure to perform this condition, among other reasons. At the first trial of June 2, 1969, he failed to account for all rentals, but by his deposition of October 21 and examination of his records his diversion of the rentals to personal use was disclosed by his own testimony, as well as at the second trial of October 29.
During this entire period, instead of attempting to comply with the breached condition, he attempted to evade performing it. This, together with the other instances of bad faith manifested by him, amply justified the trial court's dissolution of the agreements rather than allowing him yet more time to perform these breached conditions, especially considering the importance of the condition to the contract and the substantial nature of his breach.
Procedural Issue
The defendant-appellant Bullock also argues that Mrs. Thompson's motion for a new trial was improper because presented before a judgment was signed. On that basis, presumably, Bullock wishes us to disregard the further testimony he used in the second trial.
LSA-C.C.P. Article 1974 does provide that a three-day delay to apply for new trial commences to run after a judgment was signed. Here, however, no final judgment had been rendered following the first hearing and the trial court's oral reasons for its ruling, which refused to annul the agreements in question.
There being no final judgment, the trial court's reopening of the proceedings for *898 further evidence was, technically, not the granting of a new trial, but merely an exercise of its discretionary power to reopen the case for further evidence in the interests of justice. LSA-C.C.P. Articles 1631 and 1632; Monroe Grocer Co. v. J. A. Perdue & Co., 123 La. 375, 48 So. 1002; Pharr v. Shadel, 115 La. 92, 38 So. 914; Means v. Ross, 106 La. 175, 30 So. 300; Spears v. Biles, La.App.2d Cir., 121 So.2d 522; Walker v. Joyner, La.App.2d Cir., 45 So.2d 113.
We find no abuse of discretion by the trial court's reopening the note of evidence to permit further evidence after the first hearing. Further, we find no provision of the Code of Civil Procedure which prohibits a party from applying for a new or further trial before the judgment is signed. The Code simply establishes standards when such a motion is too late.
Reconventional Demand
The trial court rejected the defendant's reconventional demand in both suits. In each suit, the defendant, Bullock, had in reconvention demanded certain relief, also adopting by reference allegations of the original answer demanding, in the alternative (should the court find the contract terminated), judgment in defendant's favor for "all sums paid by defendant to petitioner on the principal indebtedness provided in the contract."[7]
On appeal, Bullock contends that the trial court erred in rejecting this reconventional demand and in holding to be forfeited, as provided by the agreements, all of his payments to Mrs. Thompson. We find that the defendant is entitled to the relief prayed for.
The contractual agreements at issue fall within the statutory designation of "bondfor-deed" contracts. LSA-R.S. 9:2941-9:2947. As there defined, see 9:2941: "A bond for deed is a contract to sell real property, in which the purchase price is to be paid by the buyer to the seller in installments and in which the seller after payment of a stipulated sum agrees to deliver title to the buyer."
The jurisprudence has established the principle that the vendor of a bondfor-deed contract is not entitled, in case of default, to retain all monies paid by the purchaser as liquidated damages, despite contract provisions to that effect. Scott v. Apgar, 238 La. 29, 113 So.2d 457. The reason is that such a penal clause is regarded as null and void, since inequitable and unreasonable and an illegal attempt to recover punitive rather than merely compensatory damages.
On the other hand, where the purchaser has gone into possession, the seller is entitled to recover the fair rental value of the premises, and the case will be remanded to establish such if not already in the record. Scott v. Apgar, cited above, at 113 So.2d 461. See also: Ekman v. Vallery, 185 La. 488, 169 So. 521; Farthing v. Neely, La.App. 3d Cir., 129 So.2d 224.
It is highly plausible that the rents collected by Bullock represent the fair rental value of the property, and thus that Mrs. Thompson is entitled to retain payments made from them. Nevertheless, we suppose the better practice would be to remand to establish fair rental value rather than to rest this finding upon conjecture.
Pruyn v. Gay, 159 La. 981, 106 So. 536 held that, if the contract expressly provides for the forfeited payments to be considered as rental, such provision will be enforced, when the evidence reflects such payments not in excess of the fair rental value of the property. However, the present contract did not provide for retention of these amounts as rental, nor does the record reflect what the fair rental value of the two large apartment complexes would be to a lessor-operator.
In Scott v. Apgar, cited above, the purchaser was held entitled to recover back not only sums paid on the contract, but *899 also sums paid for taxes and insurance. In the present instances, however, the defendant prayed only to recover back all sums he paid "on the principal indebtedness". See text at Footnote 7. We can grant him recovery for no more than he prayed for.
Decree
Accordingly, we render judgment on the reconventional demand ordering the plaintiff to return to the defendant all amounts paid as principal to her by the defendant, less a reasonable rental value for the use of the property during defendant's occupancy; together with legal interest upon this net balance, if any, from December 5, 1968 (the date of dissolution of the agreement decreed by the District Court) until paid.
The trial court's judgment in favor of the plaintiff on the principal demand is affirmed in all respects. All costs of the lower court and of appeal to date are to be paid by the defendant-appellant; subsequent costs to be determined upon final disposition of these proceedings.
Affirmed in part; remanded in part.

An Application for Rehearing.
En Banc. Rehearing denied.
NOTES
[1] $20,000 on the Second Street property, $44,000 on the Aster Street property.
[2] The agreements designated the Second Street account as the "Ha D. Thompson, Separate Escrow Account" and stipulated for the other property's revenues to be deposited into the "Ila D. Thompson, Separate Escrow AccountAster Street" in the same bank.
[3] The only two differences between the Second Street and Aster Street agreements were (a) the latter's requirement that the purchaser maintain credit-life insurance upon his life to secure payment of the unpaid principal balance and (b) this permission for the purchaser to withdraw for personal use any excess of the Aster Street revenues over monthly contract payments, expenses, and credit-life insurance premiums.
[4] The defendant-appellant, Bullock, objects to this as procedurally incorrect. This contention will be discussed below.
[5] Civil Code Article 2047 provides: "In all cases the dissolution of a contract may be demanded by suit or by exception; and when the resolutory condition is an event, not depending on the will of either party, the contract is dissolved of right; but, in other cases, it must be sued for, and the party in default may, according to circumstances, have a further time allowed for the performance of the condition."
[6] See Civil Code Article 2563, providing for resolution of a completed sale because of non-timely payment of the purchase price, which precludes judicial discretion, after judicial demand, to allow payment after expiration of the term. (The present is a commutative contract to buy and sell, not a sale.) See also 2729, which likewise prevents delay in the dissolution through judicial discretion upon breach of conditions in a lease.
[7] In the present suit, allegation 14 at Tr. 48 and 58; in the companion suit at Tr. 46 and 57.